(No. 6285.   February 24, 1937.)

HILLCREST IRRIGATION DISTRICT, Appearing by J. W. BROSE as Master, and W. T. BOOTH, ARTHUR E. CUNNINGHAM and W. H. THOMPSON, as Its Board of Directors, Appellant, v. NAMPA & MERIDIAN IRRIGATION DISTRICT et al., Respondents.

[66 Pac. (2d) 115.]

Sidman I. Barber and Oppenheim & Lampert, for Appellant.

T. L. Martin for Appellant on Rehearing.

McElroy & Chalfant, G. W. Grebe and R. B. Scatterday, for Respondents.

AILSHIE, J.—Appellant, Hillcrest Irrigation District, was organized in 1912 by E. L. Clark and associates. Clark thereafter purchased certain water rights from the Boise River from settlers under the Pioneer Dixie and American Ditch

Association canals, the same being parts of what is known in the Boise Valley as the Stewart Decree, rights 8, 45 and 96. The transfer covered 1077 inches of the natural flow of the Boise River. Deeds were procured from both the canal and land owners and the water rights were thereupon conveyed to the district. The point of diversion of these water rights was below the head of the Caldwell Highline Canal, which takes water from the Boise River below Star. The water rights appurtenant to these lands were entitled to priorities as of dates, 1864, 1869 and 1887, respectively. Water taken from the river to supply these rights is what is known as ''live water,'' that is, from the natural flow of the stream. In other words, it was not seepage or percolating water, that had been previously used for irrigation purposes farther up the stream, which had found its way back into the stream above the heads of the respective canals, leading to the lands to which it was appurtenant. This condition continued to and including 1913, and in the latter part of that year application was made to the state engineer, under sec. 3264, Rev. Codes, then in effect (which is now substantially embodied in sec. 41–216, I. C. A.), by both the vendors and the purchaser, for a permit to change the point of diversion from the canals, through which the water had been diverted from the river, to the New York Canal, at a point much farther up the stream from where the water had theretofore been diverted.

Hearing was subsequently had before the state engineer and the permit was granted (Engineer's Trans. Cert. No. 111) ; and the transfer, from the previous points of diversion to the proposed new point of diversion on the New York Canal, was made; and the water has been actually diverted from the stream through the New York Canal since July 17, 1914. It has never been used in Hillcrest Irrigation District, because the efforts made to secure sufficient water to irrigate the lands within that district from Arrowrock Reservoir, in addition to that transferred as above stated, have not been successful. The water so procured and diverted from the New York Canal since July, 1914, has, under a working agreement with the United States Reclamation Service, been used on the Boise Irrigation Project, with the understanding that

it should be so used until such time as the district could finance itself and arrange to apply the water to the lands within the district.

It appears that since 1914 all the natural flow of Boise River, during the low-water periods, has been used in the irrigation of lands up stream from the head of the Caldwell Highline Canal; and that it has been the practice, in recent years, to dam the river below the intake of that canal and divert, through the Caldwell Highline Canal, all the water of the stream that flows down that far. The irrigated lands below the head of said canal have been watered from the return flow of the river, which has been adequate for their irrigation.

It will be seen from the foregoing that, whereas "live water," of priorities of 1864, 1869 and 1887, was transferred from rights below the head of the Caldwell Highline Canal up stream to the New York Canal, such could not have been done in later years, for the reason that the lands from which such waters were transferred have not, since 1914, been dependent on, or received, "live water" or natural flow from the Boise River but have been, and are, dependent upon the return or percolating flow of water that had been previously used farther up the stream, for irrigation purposes, and which has furnished an abundant supply for these lower lands. The result has been that, during periods of shortage of water since 1914, the transfer in fact deprived the upper river water users of water which they would otherwise have had the use of, to the extent of the amounts transferred, had the change of the points of diversion not been made.

In 1931 appellant began negotiating for a sale of its water rights in order to liquidate some of its outstanding indebtedness, among which is a $40,000 bond issue; and, in order to consummate the deal, found it necessary to prosecute this action to quiet its title to these water rights. After a trial had in district court, the court entered a judgment dismissing appellant's action, from which judgment this appeal has been prosecuted.

Appellant contends here that a decree quieting its title should have been entered in the lower court upon two principal grounds, which may be stated substantially as follows:

*First,* that the permit, to make the transfer from the original points of diversion to the point up stream on the New York Canal, was and is valid, and that the transfer of the point of diversion has been made pursuant thereto; and the right to take water from the Boise River through the New York Canal, to the extent of these water rights, and according to their dates of priority, has become absolute and vested.

*Second,* that even though the permit was either irregular or invalid for any cause, nevertheless, appellant has actually diverted (or caused to be diverted) the water through the New York Canal for a period of more than twenty years and has done so openly, notoriously and adversely to the claims of respondents and everyone else and with their full knowledge; and that consequently its prescriptive right to do so is now complete and absolute. Under this heading it also contends that respondents have been guilty of such delay and laches in asserting or prosecuting any claim they may have, that they are now precluded and estopped from asserting any pretended right thereto.

Addressing ourselves to the first proposition, we find that, so far as the record discloses, the proceedings had before the state engineer, on application to change the points of diversion, were regular and apparently within the scope of his authority and jurisdiction (sec. 3264, Rev. Codes, now sec. 41–216, I. C. A.). The statute as it then existed (sec. 3265, Rev. Codes) authorized an appeal from the action of the state engineer by anyone "feeling himself aggrieved" by the order; but no appeal was ever taken and the order of the state engineer, in granting the permit, does not appear to have ever been questioned by appeal or any other judicial proceeding until this action was prosecuted. (See *First Security Bank v. State,* 49 Ida. 740, 745, 291 Pac. 1064; *In re Rice,* 50 Ida. 660, 666, 299 Pac. 664.) Notwithstanding these facts as they appear from the record, we refrain from committing ourselves as to the validity of this order, because of the conclusions which we have reached under the second grounds specified on this appeal.

We now turn our attention to the second ground urged by appellant. It satisfactorily and conclusively appears that, even though appellant's title may have been originally

questionable or uncertain, nevertheless, respondents have stood by, with full knowledge of all the facts, and for more than twenty years have allowed appellant to proceed on the theory that it had valid title to these water rights and a legal right to have the water diverted from the New York Canal; and in the meanwhile has incurred large indebtedness on the strength of its title and right until now respondents are, and should be, estopped by laches from questioning appellant's title.

It would be useless to detail at length the facts which appear in the record inducing the foregoing conclusion. That the respondents were apprised of all the facts and of the position and contention of appellant, is clear and beyond doubt. The watermaster made a notation under date of July 17, 1914, on his official report of "the Hillcrest transfer," which he noted "went into effect and continued throughout the season." The records and reports, which were introduced in evidence, show that the Hillcrest water right was referred to in the reports from year to year by this and the succeeding watermaster; and that the transfer and the diversion from the river through the New York Canal were repeatedly discussed and commented on; and no action was ever taken to prevent the use through the changed point of diversion. Respondents were also cognizant of the fact that the water was not being applied to the lands in the Hillcrest District and that it was being diverted and applied to other lands under agreement with or consent of the appellant district.

It is well established in this jurisdiction that a water right may be transferred separately from the lands on which it has been used, provided that to do so does not prejudice the rights of another water user; and that the right to segregate a water right from the lands to which it may be appurtenant inheres in the right of property and ownership in this state. (*Hard v. Boise City Irr. Co.*, 9 Ida. 589, 76 Pac. 331, 65 A. L. R. 407; *Andrews v. North Side Canal Co.*, 52 Ida. 117, 125, 12 Pac. (2d) 263; *Harris v. Chapman*, 51 Ida. 283, 5 Pac. (2d) 733; *In re Rice*, 50 Ida. 660, 666, 299 Pac. 664; *First Security Bank v. State*, 49 Ida. 740, 291 Pac. 1064; *Crockett v. Jones*, 42 Ida. 652, 657, 249 Pac. 483.)

The watermaster (Mr. Tallman) for the Boise River, from 1914 to 1924, testified that he diverted the water called for by transfer certificate No. 111 (being the engineer's certificate transferring these water rights), from the Boise River into the New York Canal at the headgate thereof, and in explanation thereof said:

"In all of our computations on the quantities of water the Pioneer Dixie Ditch Company was entitled to at any time of the year we always deducted the Hillcrest transfer from the quantity this ditch company was entitled to."

He further said that on diverting this water from the canal it was always charged to the Hillcrest Irrigation District. His successor in the watermaster's office testified to the same course of action for all the years succeeding 1924, in relation to the diversion and distribution of this water.

Mr. Tallman also testified that he advised the officers of defendant districts of the diversion of these waters through the New York Canal, and that he "explained each season to the directors of the various ditch companies, diverting water from the upper section of the river, that transfers from the lower end of the river to the upper end was very likely to affect the water rights on the upper end of the river; and that any future transfers that might arise, similar to the Hillcrest, should be stopped"; and "that if they were going to prevent the Hillcrest transfer from establishing a prescriptive right, steps should be taken within the five-year period to prevent such transfer of water from the lower end of the river to the upper end." And that, notwithstanding this warning, they took "no action to prevent it."

While it is clear that these proceedings gave the Hillcrest District color of title to the transferred water rights, we express no opinion as to what might have been decided in relation thereto, had objection been timely made to the transfer and legal action been taken.

The contention has also been made, that the description of the water rights or appropriations transferred were insufficient to work a legal transfer from the original points of diversion to the new point of diversion at the headgate of the New York Canal. This contention is answered by the fact that the description has for more than twenty years

proven sufficient in practical application to enable the various watermasters to identify it and to make diversion from year to year, so that in practice there has been no controversy or dispute over the particular water rights or appropriations that were intended to be and, in fact, were transferred. Since the description given was sufficient to enable the parties, who had to deal with the property, to accurately identify and locate it, it must be held sufficient for all practical purposes. *Id certum est quod certum reddi potest.* (*Hollister v. State,* 9 Ida. 651, 659, 77 Pac. 339; 4 Thompson on Real Property, sec. 3073.)

██ ██ It is urged by the respondent that appellant is not in position to rely on the rule of laches and estoppel, for the reason that the same was not plead by the plaintiff in stating its cause of action. This contention is untenable for the following reason: The plaintiff alleged its ownership "of 1077 inches of the waters of the natural flow of Boise river" (identifying the same) and asked that defendants be required to set forth any right or claim they had thereto. Defendant denied plaintiff's ownership and alleged ownership in the defendants. There is no provision in our practice for replication in pleading. Allegations of an answer are deemed denied. The facts which lead to the application of the doctrine of laches and estoppel appeared from the proof submitted by the respective parties on the trial. Under such circumstances it has been held by this court that the rule of laches and estoppel may be invoked without pleading the same. (*Powell-Sanders Co. v. Carssow,* 28 Ida. 201, 152 Pac. 1067; *Pettengill v. Blackman,* 30 Ida. 241, 164 Pac. 358; *Mabee v. Pacific Mut. L. Ins. Co.,* 37 Ida. 681, 219 Pac. 602.)

██ Long and continuous knowing acquiescence in another's use and enjoyment of a property or privilege may preclude one from subsequently asserting his claim. (*Ryan v. Woodin,* 9 Ida. 525, 75 Pac. 261; *Oylear v. Oylear,* 35 Ida. 732, 208 Pac. 857; *Smith v. Faris-Kesl Const. Co., Ltd.,* 27 Ida. 407, 426, 150 Pac. 25; *Just v. Idaho Canal etc. Co., Ltd.,* 16 Ida. 639, 653, 102 Pac. 381, 133 Am. St. 140.)

In *Ryan v. Woodin, supra,* the just and fair rule is stated as follows:

"Courts of equity do not favor antiquated and stale demands and refuse to interfere where there has been gross laches in commencing the proper action or long acquiescence in the assertion of adverse rights."

Here the change of point of diversion and use, whether regular and legal or not, was actually accomplished and thereafter used and enjoyed adversely. (*Harris v. Chapman*, 51 Ida. 283, 297, 5 Pac. (2d) 733.)

Many other questions have been discussed in the respective briefs but we deem it unnecessary to consider them here. The conclusions reached on the points considered suffice for a decision of the case.

It follows that the judgment of the district court must be reversed, and it is so ordered, with direction that judgment be entered quieting appellant's title. Costs awarded in favor of appellant.

Morgan, C. J., and Holden and Givens, JJ., concur.

---

ON REHEARING.

PER CURIAM.—■ In this case a rehearing was granted for the purpose of hearing argument on the question as to the jurisdiction of the district court of Ada county to hear and determine the issues in the case,—it being contended by respondent that the exclusive jurisdiction was vested in the district court of Canyon county, where the original Stewart decree was entered.

The case has been reargued and we have given the matter further consideration and think the contention of respondent is without merit. We adhere to the original opinion as filed herein.