356 P.2d 67

Ben B. JOHNSON and Dorothy A. Johnson, Husband and Wife, Plaintiffs-Appellants,

v.

STRONG ARM RESERVOIR IRRIGATION DISTRICT and Joseph Hedin, Defendants-Respondents.

No. 8837.

Supreme Court of Idaho.

Aug. 4, 1960.

Rehearing Denied Oct. 13, 1960.

Jones, Pomeroy & Jones, Pocatello, Ben B. Johnson, Preston, Baum & Peterson, Pocatello, for appellants.

480

Gee & Hargraves, Pocatello, for respondents.

McQUADE, Justice.

Appellants brought this action to enjoin respondents from interfering with their use of four cubic feet per second free flow (natural flow) rights to a certain stream known as Battle Creek. Respondents assert these water rights claimed by appellants have been surrendered to its predecessor, the Strong Arm Reservoir Company.

Prior to 1898, the predecessors of Francis J. Armstrong irrigated from the free

flow of Battle Creek, a tributary to Bear River. This being a small stream inadequate to supply sufficient water during the summer and fall months, Armstrong's predecessors, about 1893, constructed a reservoir for the storage of winter-spring runoff to supplement the free flow of Battle Creek.

In 1903, all the waters of Battle Creek were decreed, with certain minor exceptions not in issue here, to the successors in interest of Francis J. Armstrong and others. The decree, which is hereinafter referred to as the "Budge decree," after setting forth the legal descriptions of the lands (2,160 acres) included within its provisions, recites:

"That plaintiffs are the owners of, in the possession, and entitled to the possession and have used for many years upon said property above described, all of the waters, excepting as hereinafter stated, of that certain stream known as Battle Creek, with all its springs, rivulets, and sources . flowing into the same, said Battle Creek, being located in Bannock and Oneida Counties, State of Idaho, and carrying waters to said land."

In late March, 1905, Armstrong's successors in interest deeded a majority of those lands included within the purview of the Budge decree to A. W. Hart. A few days thereafter, on March 31, 1905, the Strong Arm Reservoir Company, hereinafter called the company, was organized. After its formation, the company constructed a second reservoir, and, in addition, increased the storage capacity of the one originally built by Armstrong's predecessors.

In December, 1905, A. W. Hart deeded 400 acres of those lands acquired from Armstrong's successors to Gibson R., Joseph and George M. Condie. The deed provided:

" * * * Together with any and all water rights, belonging or in any wise appertaining thereto, and especially including an undivided one half interest in and to the Henry Head Springs, also two hundred eight hundred thirty fifths (200/835) interest in and to the Strong Arm Reservoir, reserving a right of way for the Oneida Irrigation District Canal."

At approximately the same time, Hart deeded 40 acres of those lands acquired from the successors in interest of Armstrong, to Julius Johnson, the deed reciting:

" * * * Together with forty acres of water right in the Strong Arm Reservoir Company."

He also deeded 80 acres to William A. Shuldberg, which deed contains the following language:

" * * * Together with fifty acres of water right (or fifty shares of water

right in the *strong Arm Reservoir Company."

The United States District Court for Idaho, in 1920, in the case of Utah Power and Light Co., et al., v. Strong Arm Reservoir Co., et al., decreed all the waters of Battle Creek to the Strong Arm Reservoir Company, with certain minor exceptions not material here. This decree is hereinafter referred to as the Bear River decree. Shortly thereafter, respondent district was organized, succeeding to all rights and interests of the company.

Appellants, plaintiffs below, subsequently acquired approximately 240 acres of the above property, 200 acres of which had been a portion of that land conveyed by Hart. to the Condies, the remaining 40 acres being that conveyed by Hart to Julius Johnson.

In August, 1957, and 1958, appellants' water was shut off by respondent district, the latter contending appellants had used their portion of water in the reservoir to which their shares entitled them. Appellants thereupon instituted this action to enjoin respondents from interfering with their water rights, including four cubic feet per second of the free flow of Battle Creek, and the overflow waters of reservoir number one (being that reservoir originally constructed by Armstrong's predecessors) with first priorities of 1882 or before, and storage priorities for approximately 240 acres of land presently owned by appellants within the boundaries of respondent district. It is to be noted that four cubic feet per second of free flow water is for all practical purposes the entire free flow of Battle Creek. Appellants also seek injunctive relief which would preclude respondents from at any time delivering water outside the district's boundaries when appellants' water and storage priorities are not satisfied, and to require respondents to install weirs at designated points along its ditches. Although the complaint seeks damages against respondents, such were formally waived prior to trial. Trial by the court sitting without a jury resulted in judgment for respondents.

On appeal, appellants, inter alia, contend they are entitled to four cubic feet per second free flow rights of Battle Creek because when the Budge decree was entered, those lands which appellants now own were the earliest in point of time which had been subjected to irrigation by Armstrong's predecessors. Be that as it may, we think the decree itself answers appellants' assertion in this regard. We quote therefrom as follows:

"That plaintiffs are the owners of, in the possession, and entitled to the possession *and have used for many years upon said property above de-*

*scribed, all the waters * * * of that certain stream known as Battle Creek * * *."* (Emphasis supplied.)

If, in fact, appellants' lands had the oldest water right on Battle Creek, such does not appear in the decree. Indeed, said decree makes no distinction between rights made appurtenant to any of the lands included within its provisions. Appellants' lands were only a part of the 2,160 acres included within said decree. Hence, from and after its entry in 1903, the lands now owned by appellants could not in any manner be said to be possessed of a water right superior to all others awarded therein by virtue of the Budge decree. In Jeffery v. Ouldhouse, 59 Idaho 50, 80 P.2d 685, an action seeking adjudication of certain water rights, we held that where the predecessors through whom plaintiffs obtained title were bound by a former decree adjudicating said rights, then plaintiffs would be equally bound thereby. The reasoning in the Ouldhouse case is applicable to this controversy, i. e., Mr. Armstrong having been a party to the decree adjudicating the waters of Battle Creek in 1903, and appellants being in privity to the successors of Armstrong, it must be concluded that the prior adjudication is binding on appellants here. Appellants' contention is a collateral attack against the decree, which cannot be maintained in this action. McLean v. Row, 56 Idaho 646, 57 P.2d 689.

■ Appellants next contend that because the deed from Hart to the Condies in 1905 granted water rights in addition to storage rights in the Strong Arm Reservoir, and because those conveyances by Hart to Julius Johnson and William Shuldberg during the same year were silent relative to the granting of any such rights, then it must follow that Hart in his deed to the Condies intended to and did grant *all water rights* made appurtenant to Hart's lands by the Budge decree. Contrary to such contention, the trial court found that the company succeeded to all pertinent rights of Battle Creek adjudicated in the Budge decree, exclusive of the later adjudication found in the Bear River decree. The following evidence confirms this finding.

On cross-examination by appellants' attorney, the witness Kofoed testified:

"A. My understanding from Mr. Johnson's father, Julius Johnson, Shuldberg and George Condie, those old-timers in there, at the time they formed this Strong*arm* Irrigation District out there, those fellows with the decreed water put their water in the reservoir for their share of stock. The other fellows that got stock in the reservoir

furnished the money for doing the work and raising the reservoir,—they did the work and like that for stock in the reservoir. That is why they acquired stock over in Banida, some of those fellows over there.

"Q. Who told you that?

"A. Julius Johnson, William Shuldberg and George Condie.

"Q. They traded their water rights for stock?

"A. Yes, sir."

Appellants' witness Palmer testified on cross-examination:

"Q. I see. Was that reservoir No. 1 that washed out? A. Yes, sir.

"Q. At the time you were there it was owned entirely by the Armstrong people, and the reservoir company had not been organized to take it over; had it, sir? A. When I worked for Armstrong? Yes, that is right.

"Q. And then afterwards when you and your brother operated the eighty acres that you acquired you had stock in the Armstrong,—or the Strong*a*rm Reservoir Company, did you not? A. Yes, sir; had water for that eighty.

"Q. And you watered from that stock? A. Yes, sir.

"Q. And you took your water on shares, did you not? A. Yes, sir.

"Q. And, so far as you know, everybody that watered in that area took their water on shares, did they not, out of the reservoir? A. Yes."

On redirect examination, the witness answered the following questions propounded by the court:

"The Court: Yes. And then,—really what I am trying to ask you is this: Did you people feel that there was,—that your water that you were using was any different because it had been stored in the reservoir before you got it, or did you feel that the people who had a natural flow had a prior right to the water than you people who were using what you call storage water? Do you know what I mean?

"A. I don't know anybody that would have a right to a flow.

"The Court: That is what I am trying to find out. You don't make any difference then, when you say you people were all using storage water, you put you people all in the same category, all in the same class; is that correct: Or did somebody have prior rights to that water?

"The Witness: I don't think anybody. had prior rights to it."

Defendants' exhibit 27, being a partial transcript of the testimony adduced in the case of Utah Power and Light Co., et al., v. Strong Arm Reservoir Co., et al., hereinbefore referred to as the Bear River decree, reveals a stipulation of counsel, including A. W. Hart, appellants' predecessor, to the effect that the Strong Arm Company had in fact succeeded to all those water rights decreed to the Armstrongs by the Budge decree. We note here that Joseph Condie, one of appellants' predecessors, was a trustee for a party defendant to that action, being a trustee of the Strong Arm Reservoir Company. Also included in the transcript above referred to is the following testimony of William A. Shuldberg, then secretary of the Strong Arm Reservoir Company, who stated:

"Q. Now in respect to the predecessors in interest of the Strong Arm Company, do you know that the said Strong Arm Reservoir Company is the successor in interest of the plaintiffs in a decree which has been read into the record in this case? [Budge decree] A. The decree of Mr. Armstrong?

"Q. Yes. A. Yes, sir.

"Q. And the Strong Arm Company succeeded to all the rights and franchises of the said plaintiffs? A. Yes, sir."

Since the inception of the company in 1905, continuing through the years until the organization of respondent district in 1920, and thence until commencement of this action, all water users, including appellants and their predecessors, have asserted their rights to the waters of Battle Creek on a share and turn basis from respondent district. Additionally, assessments have been uniformly levied in accordance with the number of shares owned by the recipient of the water, and not upon the basis of acreage ownership within the boundaries of the district. Lastly, shares have been freely transferred, that is to say, they have been bought and sold exclusive of the land upon which the water represented thereby was being used. Considering all of the above, along with the fact that, almost without exception, every witness owning shares in the district testified that no superior right to the free flow of Battle Creek had ever been asserted by appellants' predecessors, nor by appellants prior to the institution of this action, there was an abundance of competent evidence for the trial court to conclude that the district is the owner of the free flow rights of Battle Creek.

There being competent and substantial evidence upon which the trial court could base its finding, such finding will not be disturbed on appeal. Conley v. Amalgamated Sugar Co., 74 Idaho 416, 263 P.2d

705; Jensen v. Chandler, 77 Idaho 303, 291 P.2d 1116; Shurrum v. Watts, 80 Idaho 44, 324 P.2d 380; Fuchs v. Lloyd, 80 Idaho 114, 326 P.2d 381; Shellhorn v. Shellhorn, 80 Idaho 79, 326 P.2d 64. It follows that appellants have no free flow rights to the waters of Battle Creek.

Appellants next contend respondent district is delivering water outside its boundaries contrary to law, which practice results in the deprivation to appellants of their water. To consider this assertion properly, it is necessary that we review the history of respondent district.

■ Shortly after entry of the Bear River decree, respondent district was organized. It succeeded to all rights and interests of its predecessor, the Strong Arm Reservoir Company, whose charter was forfeited after the transfer. At the time this litigation arose, the district had 907½ shares of its water stock outstanding, of which appellants owned 190. Twice subsequent to its organization, the district has issued its bonds for purposes of expanding its facilities. Presently, however, no outstanding bonded indebtedness is existent. When originally organized, the boundaries of the district were established at 844½ acres. This figure was reconfirmed by an Idaho district court decree in 1935, and has not been changed to date. Assessments for maintenance and operation, as pre-viously noted herein, are made uniformly in accordance with the number of shares owned by the recipients of the water.

Counsel agree that respondent district has failed to function in accordance with the law governing the operation of irrigation districts. In many respects, the practices of respondent district have tended more toward those of a mutual ditch company. Moreover, these methods of operation have continued, for the most part, since the district was formed. In addition, appellant Ben Johnson, an active licensed attorney at law, was legal counsel for respondent district over a number of years during which the practices he now condemns were being carried on. Needless to say, these practices have ultimately resulted in the acquisition by many members of the district of an interest therein which they would not otherwise have had. It is now appellants' position that whatever rights these persons erroneously assumed they owned should be cast aside in favor of an alleged superior interest of appellants.

In Hillcrest Irrigation District v. Nampa & Meridian Irrigation District, 57 Idaho 403, 66 P.2d 115, we held that owners of water rights who, with full knowledge of all the facts for 20 years, had allowed plaintiff to proceed on the theory that plaintiff therein had valid title to certain water rights and a legal right to have water di-

verted from a particular canal and to incur large indebtedness on the strength of such title and right, were estopped by laches from questioning plaintiff's title to such water rights, notwithstanding that plaintiff's title may have been originally questionable; further, that long and continuous acquiescence in another's adverse use and enjoyment of property or privilege precludes a person from subsequently asserting his claim.

We think the reasoning in the Hillcrest case, supra, to be pertinent and controlling here. Indeed, appellants joined with respondent district since the latter's inception in the methods of its operation. In addition, during the time appellant Ben Johnson was legal counsel for respondent district, no question arose relative to any irregular practices then being pursued. The evidence is clear that as early as 1926, water from respondent district was being delivered in the Banida area, which was outside its boundaries as established at the time of its organization in 1920. Much real property developed over this 25 to 30 year period is dependent on respondent district for irrigation water, the owners thereof having purchased shares of water stock on the faith that the waters thereby represented would be made available to them as long as such stock was held and no delinquent assessments were outstanding. ▉ Under such circumstances, equity will not raise its hand against those who acted innocently and in good faith. The rule is well settled that courts of equity do not favor antiquated or stale demands, and will refuse to interfere where there has been gross laches in commencing the proper action, or long acquiescence in the assertion of adverse rights. Ryan v. Woodin, 9 Idaho 525, 75 P. 261; Oylear v. Oylear, 35 Idaho 732, 208 P. 857.

Having disposed of the controlling issue in the controversy, it is unnecessary to consider appellants' remaining assignments of error.

The judgment is affirmed.

Costs to respondents.

TAYLOR, C. J., and SMITH, KNUDSON, and McFADDEN, JJ., concur.

On Petition for Rehearing

McQUADE, Justice.

In the petition for rehearing, appellants urge that their shares in the district were originally based upon relation of the number of acres owned by them to the number of acres within the irrigation district. The number of acres comprising respondent pseudo-irrigation district at its inception was computed in several ways, one of which described the area as including 908 acres; another, respondents' compilation, computes the acreage at 1,014.375 acres. Appellants

have not computed, for the benefit of the Court, the acreage included within the district at the time of its creation. Because of these variations, there has been confusion concerning the extent of the irrigation district. Nevertheless, appellants' shares therein are 190, as found by the trial court.

■ Respondent district has never conducted its business in accordance with Idaho laws pertaining to irrigation districts; therefore, it is such a district in name only. Characteristically, it operates as a mutual company for the distribution of water, the legal title to which it possesses. It is for this reason the Court is not applying law relating to irrigation districts.

Appellants are entitled to receive the water to which their 190 shares entitle them.

■ Findings of the trial court do not disclose that appellants are receiving 190 pro rata shares of all water available. Therefore, the cause is reversed with directions to make a determination on the present record, or, if that is insufficient, upon further hearing, whether additional measuring or control devices are required to distribute the water accurately, and, if so required, to order them installed, in accordance with the provisions of I.C. § 42–903.

The petition for rehearing is denied.

TAYLOR, C. J., and SMITH, KNUDSON and McFADDEN, JJ., concur.