477 P.2d 108

**F. N. PERN and L. M. Pern, husband and wife, Plaintiffs-Respondents,**

**v.**

**J. N. STOCKS, Clair Stocks, D. J. McIntosh and Irene McIntosh, husband and wife, LaMar Whittier and Wanda Whittier, husband and wife, and Frank's Steakhouse, Inc., Defendants-Appellants.**

**No. 10594.**

Supreme Court of Idaho.

Nov. 17, 1970.

Whittier & McDougall, Pocatello, for appellants.

Edith Anderson, Pocatello, for respondents.

McQUADE, Justice.

On January 12, 1965, the plaintiffs, F. M. Pern and L. M. Pern (respondents and cross-appellants on appeal) brought an action against J. H. Stocks and Clair Stocks and LaMar Whittier and Wanda Whittier for specific performance of the contract and damages from the claimed breach. Trial was had and judgment entered, ordering the Stocks and Whittiers to aid and assist in the assignment of a liquor license to the Perns, but denying respondents' claim for damages. Only the Whittiers have appealed.

Respondents were owners of a retail liquor license for a premises in Mackay, Idaho, at the time the contract was entered into, June 11, 1962. During the spring of that year, respondents found it necessary to abandon the building wherein the license was used. As a result, their liquor license was suspended. Defendants Clair and J. H. Stocks entered into negotiations for the purchase of the license from respondents, and a contract resulted. The contract provided:

"For one dollar ($1) and other valuable considerations the parties of the first part [Perns] do hereby assign and transfer to the party of the second part [Stocks] a certain State of Idaho Liquor License issued to them and now in force, to the party of the second part upon the following conditions agree to and to be performed by the party of the second part to-wit:

"1. The party of the second part agrees to keep said Liquor License in force and to not sell, assign, or transfer the same to anyone until after January 1, 1964, and to so conduct his operations as to save said license from forfeiture during that time.

"2. Prior to December 1, 1963, the parties of the first part agree to notify the party of the second part by registered mail whether or not they wish to repurchase said license, and in the event they intend to so repurchase said license, the party of the second part agrees to assign and transfer said license to parties of the first part for the sum of Five Hundred Dollars ($500.00), said assignment to take effect as of January 1, 1964.

"3. In the event parties of the first part exercise their option to repurchase said license party of the second part agrees to pay the State license fee on said license for six months in the sum of One Hundred Fifty Dollars ($150.00) and to be reimbursed, therefore, by parties of the first part.

"4. Party of the second part agrees to renew said license on or before December 1, 1962, and December 1, 1963.

"5. In the event the party of the second part should decide to discontinue his operation of a bar and tavern before December 31, 1963, he agrees to notify parties of the first part of such decision and assign and transfer said Liquor License to them in sufficient time for them to renew said license before its expiration."

Later during the year 1962, defendants LaMar and Wanda Whittier (herein appellants and cross-respondents) began negotiating with the Stocks to purchase the Stocks' business, including the liquor license, located in Mackay. The respondents were given notice of these negotiations in December, 1962, but made no objections to the sale and transfer of the license. The appellants purchased the Stocks' business, including the liquor license, in April, 1963. Appellants took the license with full knowledge of the interest of respondents in it.

Early in 1963, prior to the sale of the business and license to appellants, Stocks wrote respondents notifying them that he (Stocks) was ready willing and able to transfer the license back to respondents if respondents desired to repurchase the license at that time for the amount stated in the contract plus a pro-rated amount for the unused portion of the 1963 license. Stocks stated in the letter that respondents had ten days to make up their minds, otherwise, "I will feel free to transfer the same to any and all persons that I deem qualified to receive such license." Respondents replied, with the assistance of an attorney, that they were not obligated to buy the license back at that time.

Respondents had, in October of 1962, purchased the building in Mackay in which they had previously conducted their retail liquor business under the license in issue, according to their testimony such purchase being in anticipation of reacquiring the license under the terms of the contract and reopening a tavern. On November 19, 1963, respondents wrote the Stocks advising them that respondents wished to repurchase the license according to the terms of the contract. No reply was received, though Stocks and appellants had respondents' mailing address. J. H. Stocks came to Pocatello and then to Mackay in an attempt to locate the respondents, according to his testimony, but was unsuccessful. Neither he nor the Whittiers attempted to reply to repondents' letter of November 19 through the mails.

Appellants contend the trial court erred in finding the respondents had performed their initial contractual obligations under the option clause of the contract by simply notifying the Stocks of respondents' intent to exercise their option. Appellants argue the respondents were required to tender $650 in cash to the appellants. The trial court found the second numbered paragraph of the contract (*supra*) required respondents to notify the Stocks of their "wish or intent" to exercise the option prior to December 1, 1963; and that the payment of the $500 required by the contract was a concurrent condition with the assignment of the license rather than at the time of the demand. The reimbursement of the license renewal fee, as required by the contract, was to be paid after transfer of the license back to respondents.

■ This Court has followed the rule that one who seeks the remedy of specific performance of an option contract must perform all acts and duties due under the agreement to be specifically enforced.[1] The rights and liabilities of parties under a contract are limited by the terms of the contract.[2] However, where the terms are ambiguous or equivocal, the court must seek the meaning of the contract from the

1. Groth v. Continental Oil Company, 84 Idaho 409, 414, 373 P.2d 548 (1962); Texas Company v. Peacock, 77 Idaho 408, 415, 293 P.2d 949 (1956). *See* 81 C.J.S.

Specific Performance § 47; 49 Am.Jur., Specific Performance, § 117.

2. Eastern Idaho Loan and Trust Co. v. Blomberg, 62 Idaho 497, 505, 506, 113

intent of the parties.[3] This contract is ambiguous in regard to the time and method of payment of the liquor license repurchase price, once the respondents notified Perns of respondents' intent to repurchase. It is clear from the words of the contract, as the trial court found, that respondents were required to notify the Stocks by mail before December 1, 1963, if respondents intended to repurchase, as was done. The contract, however, is silent beyond this. There are no provisions as to the mechanics of payment of the $500 or the assignment of the license.

Contracts include not only what is stated expressly, but also that which of necessity is implied from its language.[4] The trial judge found, in reading the contract involved here, that the reasonable implication of the terms of that instrument was that payment of the $500 was a concurrent condition with the assignment of the license. We think that conclusion was entirely reasonable.[5] There is nothing in the evidence or in the contract to mitigate against this implication.

■ It is urged by appellants that specific performance was improperly granted because there was no contract between appellants and respondents to be enforced. Appellants were the assignees of original parties to contract. As such, they took subject to the rights of respondents under the original contract, gaining no greater title to the license than assignors originally

had.[6] Having taken the license subject to the rights of respondents therein, appellants cannot now complain that they have been ordered to meet the requirements of the contract. Nor is there any merit in the contention of appellants that notification of the exercise of the option should have been directed to the appellants as holders of the license. Appellants took the license with actual notice of the rights of respondents therein, and were given actual notice by the Stocks of respondents' notification of exercise of the option. Respondents followed the terms of the contract by sending notice of intent to repurchase to the Stocks by registered mail. The assignment of the license to appellants did not abrogate the right of respondents to give notice in the way specified in the contract and to the persons therein denoted.

■ Neither will the contention stand that the trial judge erred in finding the license was unique and therefore specific performance was available. The $500 payment due under the contract, upon return of the license to the respondents when they elected to exercise the option, does not negate the unique quality of the license. The license was originally transferred for "one dollar ($1) and other valuable considerations." (Opening paragraph of contract, *supra*.) Part of the "other valuable considerations" was that the transferors could obtain the license back January 1, 1964, by exercising the contractual option and pay-

P.2d 406 (1941); Weed v. Idaho Copper Co., 51 Idaho 737, 753, 10 P.2d 613 (1932).

3. Boesiger v. DeModena, 88 Idaho 337, 346, 347, 399 P.2d 635 (1965); Durant v. Snyder, 65 Idaho 678, 688, 151 P.2d 776 (1944); 17A C.J.S. Contracts § 295 (f).

4. Commercial Insurance Co. v. Hartwell Excavating Co., 89 Idaho 531, 541, 407 P.2d 312 (1965).

5. The Uniform Commercial Code is by statute inapplicable to this transaction (I.C. § 28–10–101), and counsel have not argued the applicability of the U.C.C. Sales provisions. We therefore are not

called upon to consider whether the license involved here is within the concept of "goods" as employed in the Sales provisions (see I.C. §§ 28–2–102 and 28–2–105). Nevertheless we find the provisions of the Sales portion of the U.C.C. instructive by analogy without deciding that issue. Section 28–2–310, I.C., provides in part that "Unless otherwise agreed * * * payment is due at the time and place at which the buyer is to receive the goods * * *." In other words, payment is normally to be concurrent with actual transfer.

6. Anderton v. Waddell, 86 Idaho 220, 224, 384 P.2d 675 (1963); 6 C.J.S. Assignments § 82, 6 Am.Jur.2d, Assignments, § 102.

ing the required amount. Thus, the $500 cannot be characterized as the value of the license as such. This arrangement is more intricate than a simple contract of sale of property, where specific performance is sought by the buyer, upon breach by the seller. The uniqueness of this license is obvious, as the trial court noted, from the fact that if it is lost, respondents would be unable to secure another for use in the town of Mackay under the state quota system. This is so because there exist, according to uncontradicted testimony, three such licenses in the town of Mackay at present. Under I.C. § 23–903, only two licenses may be issued for towns under 1,500 population, with the exception that licenses issued previously may be renewed. As the trial court noted, Mackay is a town of only 652 population. This is an appropriate subject for judicial notice, being a matter of common knowledge generally known in the area where the court was sitting.[7] Thus, contrary to the contention of appellant, there is ample support for the finding of the trial court that there could only be three liquor licenses, including the one involved here, issued in Mackay, and that this license is therefore unique.

■ The trial court found that under the contract here in issue, respondents had a right to the liquor license as against the other parties. Appellants contend the effect of this finding and the court's order is to order the Department of Law Enforcement to license respondents when they are not legally qualified. Appellants, in particular, were ordered to effectuate a transfer to respondents of the license. The judgment was filed October 30, 1969, with the license to vest as of December 1, 1969, in the respondents. Thus, it is clear the respondents had a full month in which to qualify for the license under the statutory requirements, and more particularly, under I.C. § 23–905, requiring a particular premises. Should respondents fail to meet the statutory requirements for a liquor license holder prior to transfer (after disposition

of this appeal by this Court), the state has ample machinery to safeguard its interests in the matter.[8] Respondents' qualification as license holders has nothing to do with their rights under the contract. They have a right to transfer of the license from appellants. If respondents fail to qualify, the state may exercise its statutory prerogative of revocation at that time.

■ It is contended by appellants that specific performance should not have been granted, the license being held by two individuals (Louis M. Rukavina and Thomas A. Hensley) as lessees of the appellants, who were not joined as parties to the action. Appellants cite Moody v. Crane[9] in support of this argument. The *Moody* case, however, is distinguishable from the case at bar. In the *Moody* case, the party not joined was a bank with a *pre-existing* interest in the property the appellant therein had agreed to sell the respondent. This Court held that a decree of specific performance of the contract of sale was incorrectly granted. The bank's interest would have been prejudiced by the ordered sale, or, if the bank foreclosed its lien prior to the sale (which the court could not prevent), appellant would have had no title to transfer. The bank was unconnected to the transaction giving rise to the action resulting in the judgment appealed from, and was not a party to the action. In the case at bar, the interest of Rukavina and Hensley was acquired *subsequent* to that of respondents. It was stipulated at trial that all transferees of the license knew of the contract in issue, and Rukavina and Hensley held the license as transferees of appellants at that time. The lease under which Rukavina and Hensley hold the license was entered into while this action was awaiting trial. Appellants now seek to thwart respondents' quest for the license by interposing these additional parties, who have acquired their interest in the license through appellants, as persons beyond the jurisdiction of the trial court in this action. Such a ploy cannot succeed. It has previ-

---

7. City of Lewiston v. Frary, 91 Idaho 322, 325, 420 P.2d 805 (1966).

8. See Chapter 9, Title 23, Idaho Code.

9. 34 Idaho 103, 199 P. 652 (1921).

ously been held in Carver v. Ketchum that one who takes an interest in property subsequent to the filing of an action seeking to establish ownership of the property can acquire no greater title than the defendant-transferor had in the property, and the subsequent interest is bound by the judgment in the previously begun action, regardless of the fact that the subsequent transferee was *not* a party to the action. The Court in that case stated:

> "The rule would seem to be that every person is a privy to a judgment or decree who has succeeded to an estate or interest held by one who was a party to such judgment or decree, if the succession accrued subsequent to the commencement of the action. Privity to the judgment in such case implies a relationship by succession or representation between the parties to the second action * * * in respect to [the] rights adjudicated in the first action."[10]

Therefore, the trial court's judgment is binding upon Rukavina and Hensley, they having taken their interest in the license subsequent to the commencement of this action from the appellant herein. Additionally, the question is effectively moot, since the lease under which Rukavina and Hensley hold the license expires December 1, 1970, and the license reverts to appellants.

Appellants make multiple assignments of error regarding the trial court's findings of fact. We have considered these additional assignments of error, and conclude they are without merit. There is ample evidence in the record to support the findings assailed by appellants.

■ Respondents, on cross-appeal, assert that there was error below in that the trial court found respondents had not proven any damages. The only specific

evidence submitted by respondents on this issue was evidence of previous operating profits (when respondents operated a bar in Mackay under this license in 1960 and 1961) and of the expenditures made by them in securing a premises in anticipation of their reacquisition of the license under the terms of the contract. The evidence of previous operating profits consisted of tax returns filed by respondents for the years 1960 and 1961. At best, this evidence was inconclusive as to damages, showing a net profit of $107.59 in 1960 and a net loss of $229.49 in 1961.

The evidence tending to show expenditures made in securing a premises for the operation of a tavern, in anticipation of respondents' reacquisition of the license under the contract shows the respondents purchased the building at a tax sale, paying $100 down on October 8, 1962, and thereafter, making payments on the balance due ($900 plus interest) of $261 on November 4, 1963, $252.04 on October 1, 1964, and $244.50 on October 27, 1965. Thereafter, respondents testified they ceased making payments and gave up the building, in despair of ever getting the license back. On the basis of this evidence, we cannot say the trial court erred in finding respondents had not proven any damages. Damages must be proven with reasonable certainty; they cannot be the product of speculation on the part of the finder of fact.[11] While the evidence adduced at trial might be read as proving respondents sustained certain damages, it is not so clear and weighty as to be susceptible to only that reading.

Judgment affirmed. Costs to respondents.

McFADDEN, C. J., and DONALDSON, SHEPARD, and SPEAR, JJ., concur.

10. Carver v. Ketchum, 53 Idaho 595, 598–599, 26 P.2d 139, 140 (1933). *See also* Sutton v. Brown, 91 Idaho 396, 422 P. 2d 63 (1966); Johnson v. Strong Arm Reservoir Irrigation District, 82 Idaho 478, 356 P.2d 67 (1960); Smith v. Kessler, 22 Idaho 589, 127 P. 172 (1912); 50 C.J.S. Judgments §§ 787, 788.

11. Big Butte Ranch, Inc. v. Grasmick, 91 Idaho 6, 10, 415 P.2d 48 (1966); Head v. Crone, 76 Idaho 196, 200, 279 P.2d 1064 (1955).