# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket Nos. 46912 & 46913

TRICORE INVESTMENTS, LLC, an
Idaho limited liability company,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

THE ESTATE OF FRANCES ELAINE
WARREN, deceased, acting through the
Court-Appointed Co-Personal
Representatives, DANIEL ROBERT
WARREN and CHRISTOPHER GEORGE
WARREN; PLBM, LLC, an Idaho limited
liability company; and JOHN STOCKTON,
an individual,

    Defendants-Appellants/
    Cross-Respondents,

and

TODD BRINKMEYER, an individual,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2021 Term

Filed: April 14, 2021

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Barbara A. Buchanan, District Judge.

The district court's judgment is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Costs and attorney fees on appeal are awarded to Tricore as to the Estate only.

Witherspoon Brajcich McPhee, PLLC, Spokane, Washington, attorneys for Appellants/Cross-Respondents Estate of Frances Elaine Warren and John Stockton. James McPhee argued.

Lukins & Annis, P.S., Spokane, Washington and Stoel Rives, LLP, Boise, Idaho, attorneys for Appellant/Cross-Respondent Todd Brinkmeyer. William Christopher Pooser argued.

1

Roberts Freebourn, PLLC, Spokane, Washington and Featherston Law Firm, Sandpoint, Idaho, attorneys for Respondent/Cross-Appellant. Brent Featherston and Kevin Roberts argued.

_____

BEVAN, Chief Justice

This appeal arises from a contract dispute. The Estate of Frances Elaine Warren ("Estate") entered into a purchase and sale agreement with Tricore Investments, LLC ("Tricore") involving real property near Priest Lake in Bonner County, Idaho. However, before closing, the Estate sold the property to other buyers: John Stockton and Todd Brinkmeyer. Tricore filed a complaint against the Estate for breach of contract and violation of the Idaho Consumer Protection Act ("ICPA"), among other things, and sought specific performance of the purchase and sale agreement. The complaint also alleged that Stockton and Brinkmeyer tortiously interfered with the purchase and sale agreement and that the Estate, Stockton, and Brinkmeyer (collectively, "Appellants") engaged in a civil conspiracy.

The Estate asserted a statute of frauds defense, which the district court dismissed on summary judgment. The case proceeded to a bench trial where the district court made these findings: 1) the purchase and sale agreement between the Estate and Tricore constituted a valid and enforceable contract; 2) the Estate breached the contract when it sold the property to Stockton and Brinkmeyer; 3) the Estate's actions violated the ICPA; 4) Stockton and Brinkmeyer tortiously interfered with the contract; and 5) the Appellants engaged in a civil conspiracy. The district court ordered specific performance of the contract but declined to award any additional damages. The district court awarded Tricore its fees and costs against Appellants on a joint and several basis. Additionally, the district court granted Appellants' motion to stay enforcement of the judgment pending appeal and required Appellants to post a supersedeas bond.

The Estate and Stockton jointly appealed. Brinkmeyer appealed separately. The Estate argues the purchase and sale agreement is not a valid, enforceable contract because it violates the statute of frauds and there was no meeting of the minds. In the alternative, the Estate argues it did not breach the contract because Tricore repudiated it. The Estate also argues it did not violate the ICPA. Stockton and Brinkmeyer argue they did not tortiously interfere with the purchase and sale agreement. Together, Appellants argue they did not engage in a civil conspiracy and that the district court's attorney fee award against them on a joint and several basis was erroneous.

2

Brinkmeyer alone appeals the supersedeas bond amount. Tricore cross-appealed. Tricore argues the district court erred in failing to award damages for the Estate's violation of the ICPA and for Stockton and Brinkmeyer's tortious interference.

We consolidated the appeals of the Estate, Stockton, and Brinkmeyer for purposes of this opinion, even though the two appeals were argued and briefed separately. We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

For decades, the Warren family owned real property near Priest Lake in Bonner County, Idaho. The property included undeveloped lake frontage and wetlands. Around 1990, Bill and Elaine Warren sold a portion of their property to Brinkmeyer's parents. Around the same time, Bill and Elaine sold another portion of their property to Stockton. Before the Warren and Stockton sales closed, the Warrens asked Stockton if they could move the already agreed upon property line. In return, the Warrens promised Stockton they would come to him first if they were going to sell any of their property in the future, which Stockton characterized as a right of first refusal. The property line was moved, but the parties never memorialize the promise in writing. Shortly after, Bill Warren passed away. Elaine Warren passed away in 2003. The Estate was formed after Elaine's passing and her sons, Dan and Chris Warren, serve as the Estate's co-personal representatives.

In 2014, plagued by the property's back taxes, the Estate obtained a loan on the property. The Estate then decided to sell some of its property and use the proceeds to pay back the loan when it became due. On May 20, 2014, John Finney, the Estate's legal counsel, emailed Stockton about the Estate's interest in selling. Attached was a plat map of the property, which included three parcels: Parcels A, B, and C. At that time, the Estate was seeking to sell Parcel B, which included around forty-five acres and was appraised around $5,200,000. Finney explained that the Estate was "willing to sell Parcels A and C if a buyer want[ed] to take on the responsibility of platting a waterfront parcel for [Chris and Dan Warren] . . . ." Stockton made no offer on any of the Warren property at that time. About a year later, Finney again emailed Stockton. In that email, Finney explained that the Estate was listing the Warren property at "a purchase price closer to the range [Stockton] indicated [he was] comfortable with" when the two previously communicated. Again, Stockton declined to purchase any of the Warren property.

3

On July 2, 2015, the Estate retained Teague Mullen[1] as its real estate agent to assist in the sale of Parcel B. The seller representation agreement provided Parcel B was around forty-five acres and set a listing price of $2,000,000. Clifford Mort, the owner of Tricore, seeing substantial development opportunities in the property, became interested in purchasing the listed property. On October 6, 2015, the Estate entered into a purchase and sale agreement with Tricore. Tricore's offer was contingent on its ability to perform a feasibility study. Tricore had forty-five days to conduct the feasibility study but could extend that time for additional earnest money. The agreement also required the Estate to provide Tricore with all historical information on the property within those forty-five days.

Sometime between October 6, 2015, and November 11, 2015, the parties entered into the first addendum to the purchase and sale agreement. The first addendum incorporated the terms of the original purchase and sale agreement and included more definite legal descriptions of the property being sold. The first addendum also listed the property's restrictive covenants and encumbrances, none of which disclosed any right of first refusal to Stockton. Tricore, however, did not "put up the earnest money" because the Estate failed to provide Tricore with enough information to move forward in the process.

Despite falling out of contract with the Estate, Tricore remained interested in purchasing the property. Tricore continued to work with Mullen–negotiating a purchase of all of the Warren's waterfront property from the Estate. The negotiations were fruitful, leading Tricore and the Estate to enter into the second addendum to the original purchase and sale agreement on June 24, 2016. The original purchase and sale agreement, the first addendum, and the second addendum together form the Tricore Purchase and Sale Agreement (hereinafter, "Tricore PSA"). Pursuant to the Tricore PSA, Tricore deposited $20,000 in earnest money and the earnest money became nonrefundable on July 31, 2016, after the feasibility period ended.

The Tricore PSA added Parcel A to the sale. Thus, the Estate agreed to sell Parcels A, B, and C, which comprised about sixty-five acres (hereinafter, the "Warren Property").[2] The Tricore PSA purchase price was $2,400,000. In addition, the Tricore PSA provided:

---

[1] Mullen served as a dual agent representing both the Estate and Tricore.

[2] To differentiate between the property subject to the Tricore PSA and the Warren's property as a whole, the property subject to the Tricore PSA is hereinafter referred to as "Warren Property" and the Warren's property as a whole is referred to generally as "the property."

> The Sellers reserve and retain from Parcel A and Buyer shall create in compliance with Bonner County Planning and Zoning provisions and approval, a parcel(s) in size not less than 200 feet of waterfront (or two 100 foot parcels—consistent with Buyer's development) adjacent to Tax 31 between the existing access road and the lake.

The Tricore PSA's closing date was September 9, 2016, but Tricore could extend that date by paying additional earnest money.

On August 5, 2016, the Estate provided Tricore a revised plat map of the Warren Property. The revised map divided the original three parcels into five parcels, Parcels A, B, C, D, and E. The Warren Property remained unchanged. However, at that time, Mort came to understand that the Tricore PSA did not include "all of the waterfront" of the property. The revised map showed that approximately three hundred feet of waterfront located at the east end of the property was not included in the sale. Instead, the Warren Property included *most* of the waterfront, as illustrated directly below by the highlighted area containing horizontal lines identifying Parcels A, B, and C, the parcels subject to the Tricore PSA.



Recognizing that losing the additional waterfrontage changed the development process, Mort instructed his counsel, Chuck Lempesis, to negotiate with Finney on how to move the project forward. Mort, Lempesis, and Finney met on August 9, 2016, to discuss the misunderstanding regarding the 318-feet of waterfront, as well as issues related to the existing water system, sewer service, and fill materials for the wetlands. After that meeting, Mort proposed the following terms in an email to Lempesis:

1) $2.1 million purchase price[.]
2) [The Estate] to grant to [Tricore] existing water system and all water rights to the property.

3)     [The Estate] to grant to [Tricore] any necessary easement's needed for all utilities and access to the property[.]

4)     [The Estate] to allow [Tricore] up to 160,000 yards of sand/structural fill material ([Tricore] to haul from [Tricore's] pit property)[.]

5)     [Tricore] to deposit additional $10,000 non refundable Property closing shall be extended to 12/31/16[.]

Lempesis forwarded the email to Finney on August 17, 2016. Negotiations continued regarding the Warren Property's water system and the possibility of pricing fill material. On September 1, 2016, Lempesis texted Finney asking if the Estate's representatives would meet with Mort. In that text, Lempesis stated, "[Mort's] counter is 2.25 and a dollar a yard for dirt. This could go south. Are you available to meet[?]" Finney responded with a suggested time of 3:30 p.m. However, that meeting never occurred. In fact, no further meetings between the Estate and Tricore occurred.

After learning about Tricore's proposed development, and concerned about preserving the existing characteristics of the area, Stockton and Brinkmeyer agreed to pursue purchasing the Warren Property. On September 2, 2016, Stockton and Brinkmeyer entered into a purchase and sale agreement with the Estate for the Warren Property for $2,500,000 ("Stockton PSA"). The Estate, Stockton, and Brinkmeyer also signed an indemnification agreement in which Stockton and Brinkmeyer agreed to indemnify the Estate up to $100,000 against any claims Tricore brought against the Estate.

 On September 6, 2016, the Estate, Stockton, and Brinkmeyer closed on the Stockton PSA. Stockton and Brinkmeyer simultaneously assigned the Warren Property to Stockton's limited liability company, PLBM.[3] Also on September 6, 2016, Finney emailed Mullen and Lempesis, informing them that the Estate decided to proceed in a "different direction." Lempesis, shocked by the Estate's unexpected termination, responded and explained that the Tricore PSA was a binding agreement. Lempesis tendered another $10,000 to extend the deadline for closing to October 7, 2016, as provided for in the Tricore PSA. Days later, Tricore independently discovered the Estate had sold the Warren Property to Stockton and Brinkmeyer.

Shortly after discovering these facts, Tricore filed a complaint against the Estate, PLBM and John Does 1-10. Tricore later amended its complaint naming Stockton and Brinkmeyer. Tricore alleged the Estate breached the Tricore PSA and violated the ICPA. Tricore also alleged

---

[3] Stockton and PLBM will be collectively referred to as "Stockton" for purposes of this appeal unless otherwise indicated.

Stockton and Brinkmeyer tortiously interfered with the Tricore PSA and that the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy. Tricore sought specific performance of the Tricore PSA. The Estate, Stockton, and Brinkmeyer answered separately, each asserting the affirmative defense of the statute of frauds.

Both Tricore and the Estate then moved for summary judgment as to the statute of frauds, with Tricore seeking to dismiss the Estate's affirmative defense, while the Estate sought to enforce its defense. The district court, after consideration of the cross motions and a motion to reconsider, dismissed the Estate's statute of frauds defense.

The case proceeded to a six-day bench trial. The district court later issued its decision and order. The district court found the Tricore PSA was a valid and enforceable contract, Tricore did not repudiate the Tricore PSA, and the Estate breached the Tricore PSA by selling the Warren Property to Stockton and Brinkmeyer. The district court also found that Stockton and Brinkmeyer tortiously interfered with the Tricore PSA, the Estate violated the ICPA, and the Appellants engaged in a civil conspiracy. For a remedy, the district court found Tricore was entitled to specific performance but no other damages. The district court subsequently awarded Tricore attorney fees and costs against the Appellants on a joint and several basis. Appellants moved the district court to stay enforcement of the judgment. The district court granted the motion and ordered Appellants to post a supersedeas bond in the amount of $672,426.30 with an additional amount of $362,069.61 to compensate Tricore for its loss of use of the Warren Property during the appeal.

The Estate and Stockton jointly appealed. Brinkmeyer also timely appealed. Tricore timely cross-appealed. For purposes of our decision, the appeals of the Estate, Stockton, and Brinkmeyer, together with Tricore's cross-appeal, have been consolidated and this opinion will address all of their arguments, although some arguments were made solely by the Estate, Brinkmeyer, or Tricore.

## II. ISSUES ON APPEAL

1. Whether the district court erred in granting summary judgment for Tricore on the Estate's statute of frauds defense.
2. Whether the district court erred in finding the Tricore PSA was a valid and enforceable contract.
3. If the Tricore PSA was a valid and enforceable contract, whether the district court erred in finding that Tricore did not repudiate the Tricore PSA.
4. Whether the district court erred in finding the Estate violated the ICPA.
5. Whether the district court erred in finding Stockton and Brinkmeyer tortiously interfered with the Tricore PSA.

7

6. Whether the district court erred in finding the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy.
7. Whether the district court abused its discretion by awarding Tricore fees and costs against the Estate, Stockton, and Brinkmeyer on a joint and several basis.
8. Whether the district court abused its discretion by requiring the Estate, Stockton, and Brinkmeyer post an additional bond amount of $362,069.61 to compensate Tricore for its loss of use of the property during this appeal.

## III. ISSUE ON CROSS-APPEAL

1. Whether the district court erred in declining to award damages to Tricore for Stockton and Brinkmeyer's tortious interference and for the Estate's violation of the ICPA.

## IV. STANDARDS OF REVIEW

"[T]he standard of review for this Court when reviewing a district court's grant of summary judgment is well-settled: this Court uses the same standard properly employed by the district court originally ruling on the motion." *Drakos v. Sandow*, 167 Idaho 159, 162, 468 P.3d 289, 292 (2020) (internal quotations omitted).

> A moving party must support its assertion by citing particular materials in the record or by showing the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[s]. Summary judgment is improper if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented. Even so, a mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment.

*Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 140–41, 456 P.3d 201, 209–10 (2019) (internal citations and quotations omitted). "[W]hen reviewing the grant or denial of a motion for reconsideration following the grant of summary judgment, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." *Drakos*, 167 Idaho at 162, 468 P.3d at 292 (quoting *Ciccarello v. Davies*, 166 Idaho 153, 159, 456 P.3d 519, 525 (2019)).

"Following a bench trial, this Court's review is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Wilson v. Mocabee*, 167 Idaho 59, 64, 467 P.3d 423, 428 (2020) (quoting *Mortensen v. Berian*, 163 Idaho 47, 50, 408 P.3d 45, 48 (2017)). This Court will not set findings of fact aside unless the findings are clearly erroneous. *Id.* "In view of this role, the trial court's findings of fact will be liberally construed in favor of the judgment entered." *Id.* (quoting *Borah v. McCandless*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009)). "Findings of fact that are supported by substantial and

8

competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). "Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion." *Id*. (quoting *Kelly v. Wagner*, 161 Idaho 906, 910, 393 P.3d 566, 570 (2017)).

Idaho Appellate Rule 13(b) authorizes district courts to take certain actions during an appeal, such as issuing stays and requiring a supersedeas bond. Because the district court has the authority, but is not required, to take such actions under I.A.R. 13(b), this Court reviews these actions under an abuse of discretion standard. *See In re Idaho Workers Comp. Bd*., 167 Idaho 13, 24, 467 P.3d 377, 388 (2020) (emphasis in original) (holding that I.R.C.P. 11.3(c), which provides "the court *may* dismiss . . ." is reviewed for an abuse of discretion because "[the rule] does not mandate the court to do either one. Rather, [the rule] provides that a court *may* dismiss the claims with prejudice or *may* enter a default judgment, leaving the decision to the sound discretion of the district court."). An abuse of discretion inquiry considers whether the district court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. "This Court [also] reviews a district court's award of attorney fees for an abuse of discretion." *Alsco, Inc. v. Fatty's Bar, LLC*, 166 Idaho 516, 533, 461 P.3d 798, 815 (2020).

## V. ANALYSIS

The Estate, Stockton, and Brinkmeyer assert several alleged errors on appeal. The Estate argues the Tricore PSA is not a valid and enforceable contract. The Estate maintains the Tricore PSA violates the statute of frauds and that there was no meeting of the minds between the Estate and Tricore. Alternatively, the Estate argues if the Tricore PSA is valid and enforceable, the Estate did not breach the Tricore PSA because Tricore repudiated it. The Estate also argues it did not violate the ICPA.

Stockton and Brinkmeyer, relying on the Estate's position that the Tricore PSA is invalid and unenforceable, argue the claim against them for tortious interference with contract is unsubstantiated. More, Stockton and Brinkmeyer argue that if the Tricore PSA is valid and enforceable, they did not tortiously interfere with it because they pursued purchasing the Warren Property in good-faith based on Stockton's alleged right of first refusal.

Together, the Estate, Stockton, and Brinkmeyer argue they did not engage in a civil conspiracy. As a result, Appellants argue the district court erred in awarding Tricore attorney fees and costs against them on a joint and several basis. Brinkmeyer alone argues the $362,069.61 required to compensate Tricore for its loss of use of the property during this appeal was erroneous

Tricore cross-appeals. Tricore argues it should have been awarded monetary damages for Stockton and Brinkmeyer's tortious interference and for the Estate's violation of the ICPA.

## A. The Tricore PSA does not violate the statute of frauds.

Below, Tricore moved for partial-summary judgment asking the district court to dismiss the Estate's statute of frauds defense. The Estate also moved for summary judgment asking the district court to dismiss Tricore's breach of contract claim arguing the Tricore PSA violated the statute of frauds. The district court found there were triable issues of fact on the statute of frauds defense and denied both Tricore's and the Estate's motions. The Estate moved the district court to reconsider and argued that the reservation of "not less than 200 feet of waterfront" violated the statute of frauds because it failed to describe the property reserved with exactness. On reconsideration, the district court held that the Tricore PSA did not violate the statute of frauds and dismissed the defense.

The Estate argues the district court erred in dismissing its statute of frauds defense. The Estate maintains the description of "not less than 200 feet of waterfront" violates the statute of frauds because it fails to sufficiently describe the property being reserved. According to the Estate, "not less than 200 feet of waterfront" does not sufficiently describe the reserved property because it does not provide the exact size, dimensions, or location of the reserved property.

Tricore asserts the Estate is barred from raising a statute of frauds defense because the Estate acknowledged the existence of the Tricore PSA. Analogizing to an oral contract, Tricore asserts "[a] defendant's admission of an unwritten contract during the course of litigation will prevent the defendant from relying upon the statute of frauds." *Peterson v. Shore*, 146 Idaho 476, 479, 197 P.3d 789, 792 (Ct. App. 2008). "[I]n order for an admission to operate to remove the bar of the [statute of frauds], it must in fact be an acknowledgment of the contract alleged, whether the admission is contained in a complaint, responsive pleading, deposition, other testimony, or otherwise in a judicial proceeding." *Id*. Thus, "[i]t must be clear from the defendant's judicial statement that there is an unqualified or unconditional admission of . . . facts which would constitute the formation of a valid, oral contract." *Id*. at 479–80, 197 P.3d at 792–93 (internal

10

quotations omitted). When an admission "consists of statements merely confirming . . . that the defendant had agreed to certain terms different from those alleged by the plaintiff, it will not operate to remove the alleged contract" from the statute of frauds. *Id*. at 480, 197 P.3d at 793.

Tricore's argument is inapt because the Tricore PSA was in writing. In addition, the Estate did not admit the existence of a valid and enforceable contract in any judicial proceeding. At all stages of litigation, beginning with its initial answer, the Estate argued the Tricore PSA was invalid and unenforceable. In response to Tricore's partial motion for summary judgment, the Estate argued the Tricore PSA was invalid and unenforceable. In the motion for reconsideration, the Estate again argued the Tricore PSA was invalid and unenforceable. Even after the district court dismissed the Estate's statute of frauds defense, the Estate continued to argue the Tricore PSA was invalid and unenforceable on other grounds. In sum, arguing whether Appellants admitted the contract "exists" is not really the point. The key is that they argued that it did not exist "as a valid and enforceable contract." Merely, arguing that a contract is invalid and unenforceable is not tantamount to admitting it exists. Thus, the record does not support a finding that the Estate sufficiently admitted the existence of the Tricore PSA in a judicial proceeding to remove the bar of the statute of frauds.

As to the merits of the defense, the district court ruled that the statute of frauds is satisfied by the legal description contained in the PSA here. We agree. But before we reach that point, we voice our concern whether the statute of frauds is even available to the Estate as a defense in this case. "By its plain language, [section 9-505] governs contracts or agreements . . . . Its purpose is to prevent false or fraudulent contract claims by forbidding disputed assertions of certain types of contracts without any written memorandum of the agreement." *McKoon v. Hathaway*, 146 Idaho 106, 111, 190 P.3d 925, 930 (Ct. App. 2008). The statute of frauds "is to shield persons with interests in land from being deprived of those interests by perjury, not to arm contracting parties with a sword they may use to escape bargains they rue." *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 128 (3rd Cir. 1997); *see also Gibson v. Arnold*, 288 F.3d 1242, 1247 (10th Cir. 2002) ("[T]he purpose of the statute of frauds is to shield persons with interests [covered by the statute] from being deprived of those interests by perjury, not to arm contracting parties with a sword they may use to escape bargains they rue."). The interest and purpose of the statute of frauds is not served by the Estate using it as a sword against Tricore to escape its own breach of contract. It is telling that the Stockton PSA uses nearly the identical property description as contained in the

PSA between the Estate and Tricore. Even so, Tricore failed to raise this question directly, and our concerns do not underpin the decision we announce today. They are noted simply as an additional impediment to the statute of frauds being used in the manner sought by the Estate.

> Idaho Code section 9-505 requires certain agreements to be in writing. Section 9-505, in relevant part, provides: In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents:
> . . . .
> 4. An agreement for . . . the sale[] of real property, or of an interest therein[.]

I.C. § 9-505(4). "[T]he great majority of courts have held that executory contracts and agreements for the sale of real estate must be complete and speak in definite terms of all the conditions, terms, and descriptions necessary to constitute the contract." *Lexington Heights Dev., LLC v. Crandlemire*, 140 Idaho 276, 280, 92 P.3d 526, 530 (2004) (quoting *Allen v. Kitchen*, 16 Idaho 133, 141, 100 P. 1052, 1055 (1909)). Thus, "a description of real property must adequately describe the property such that it is possible for someone to identify 'exactly' what property the seller is conveying to the buyer." *The David and Marvel Benton Tr. v. McCarty*, 161 Idaho 145, 151, 384 P.3d 392, 398 (2016) (quoting *Ray v. Frasure*, 146 Idaho 625, 629, 200 P.3d 1174, 1178 (2009)). "In order to exactly identify the property that is being conveyed, 'a description . . . [must be written such that] quantity, identity, or boundaries can be determined.' " *Id*. at 153, 384 P.3d at 400 (quoting *Garner v. Bartschi*, 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003)).

In *Ray*, this Court tempered the notion that a sufficient property description, for the statute of frauds, need only designate the land being conveyed with reasonable certainty. 146 Idaho at 629, 200 P.3d at 1178. Instead, we noted that "a property description [must] designate 'exactly' what property the seller is conveying to the buyer." *Id*. at 629–30, 200 P.3d at 1178–79 (quoting *Garner*, 139 Idaho at 435–36, 80 P.3d at 1036–37). While the word "exactly" normally means "in a manner or measure or to a degree or number that strictly conforms to a fact or condition," *Exactly*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/exactly (last updated Feb. 1, 2021), in the statute of frauds context "exactly" designates the "quantity, identity, or boundaries [that] can be determined" from the sales document itself, or by reference to extrinsic evidence to which it refers. *Id*. Thus, we held that a "physical address is not a sufficient description of the property for purposes of the statute of frauds." *Id*. at 630, 200 P.3d at 1179. Such a description

12

alone is not sufficient because "[t]he physical address gives no indication of the quantity, identity, or boundaries of the real property." *Id*. We ultimately relied on the holding of *Lexington Heights:* "[a] description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *Id*. at 629, 200 P.3d at 1178 (quoting 140 Idaho at 281–82, 92 P.3d at 531–32).

In *Lexington Heights*, this Court invalidated a contract for the sale of land that failed to sufficiently describe the boundaries of a five-acre parcel the parties intended to reserve from the sale of a larger ninety-five acre parcel. 140 Idaho at 282, 92 P.3d at 532. There, the sellers contracted to sell approximately ninety of ninety-five acres they owned to buyers and described the property as "the real property situated in Ada County, Idaho located at 1400 West Floating Feather Road, consisting of approximately ninety (90) acres . . . however excluding the residential dwelling (which will include no more than five acres) . . . ." *Id*. at 278, 92 P.3d at 528. The contract also provided that the "precise size, location, dimensions and configuration" of the excluded five-acre parcel reserved by the seller was to be mutually determined later. *Id*. Because the "precise size, location, dimensions and configuration" of the reserved five-acre parcel were left open–to be mutually determined–this Court held the precise boundaries were material and the parties had to agree upon such boundaries in writing for the contract to satisfy the statute of frauds. *Id*. at 282, 92 P.3d at 532. We also prohibited the buyer from introducing extrinsic evidence to identify the location of the reserved five-acre parcel. *Id*. at 283, 92 P.3d at 533. We noted that extrinsic evidence may be admitted "for the purpose of identifying the land described and applying the description to the property" but extrinsic evidence may not be admitted to supply and add "to a description insufficient and void on its face." *Id*. We reasoned:

> Although the [contract] provides that the parcel excluded from the sale would include the land upon which the residence, swimming pool, tennis court, and volleyball court were located, the excluded property was not limited to such land. The [contract] did not simply exclude from the sale the residence, swimming pool, tennis court, and volleyball court, and the land upon which such structures were located. Rather, it excluded "the existing residential dwelling situated on the Premises together with no more than five (5) acres immediately surrounding the proposed residential development (which five (5) acres will include the existing tennis court, volleyball court, and swimming pool)." It is clear from the face of the [contract] that the excluded property was more than the land upon which these structures were located. Thus, extrinsic evidence could certainly identify the structures described, but there was nothing in the [contract] from which [one] could identify the boundaries of the approximate five-acre parcel that would include, but

13

not be limited to, the land upon which those structures were located. The [contract] did not reference as the boundaries of the excluded parcel any structure or landmark (e.g., the existing fence enclosing the residence, swimming pool, tennis court, and volleyball court) that could then be identified by parol evidence.

*Id.* at 283–84, 92 P.3d at 533–34.

Here, the Tricore PSA provides legal descriptions for the Warren Property, which encompasses Parcels A, B and C. The sufficiency of those legal descriptions is undisputed by the parties. The Tricore PSA also provides:

> The Sellers reserve and retain from Parcel A and Buyer shall create in compliance with Bonner County Planning and Zoning provisions and approval, a parcel(s) in size not less than 200 feet of waterfront (or two 100 foot parcels—consistent with Buyer's development) adjacent to Tax 31 between the existing access road and the lake.

The district court relied on *Lexington Heights* in finding the reservation of "not less than 200 feet of waterfront" did not violate the statute of frauds. The district court found:

> As set forth in *Lexington Heights*, . . . the law makes a distinction between the consideration of extrinsic evidence "for the purpose of identifying the land described and applying the description to the property" versus "that of supplying and adding to a description insufficient and void on its face." The former is allowed. The latter is not. Therefore, the crucial question is what purpose does the consideration of extrinsic evidence, to wit: Bonner County Planning and Zoning provisions and the configuration of the development, serve in the [Tricore] PSA? In *Lexington Heights*, the Idaho Supreme Court makes clear that "**the issue with respect to the statute of frauds is not whether the parties had agreed upon the precise dimensions of the property to be sold. It is whether the written memorandum contains an adequate description of the property to be sold.**" Hence, the determinative issue is not whether the [Tricore] PSA contains the precise dimensions of the parcel(s) to be carved out from Parcel A, but whether [the Tricore] PSA contains an adequate description of the real property to be sold, in this case, Parcels A, B. [sic] and C.
>
> Upon consideration of the applicable law, and drawing the most probable inferences from the undisputed evidence properly before it, this [c]ourt finds as a matter [of] law, first, that the legal descriptions of Parcels A, B, and C in Paragraph 3 of Addendum #2 (including the parcel map depicted on Exhibit "B" to Addendum #1, which is reference in Paragraph 3) are sufficient because the "quantity, identity or boundaries of . . . [each parcel] can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." Second, the [c]ourt finds as a matter of law that the purpose of considering extrinsic evidence (in the form of Bonner County Planning and Zoning provisions and the configuration of the development) to create a parcel for the Estate to be carved out from Parcel A is not to supply and add to a description that is insufficient and void on its face. This [c]ourt has already found the descriptions of Parcels A, B. [sic] and C are sufficient.

14

Rather, the purpose of considering such evidence is to identify the land described and apply the description to the property. In sum, the [c]ourt finds as a matter of law that the [Tricore] PSA does not violate the statute of frauds because it contains an adequate description of the property to be sold, as well as the sales price, and thus, is "complete and speak[s] in definite terms of all the conditions, terms, and descriptions necessary to constitute the contract."

(Internal citations omitted) (Emphasis in original). We find the district court's reasoning sound and adopt it in full. The Tricore PSA speaks for itself; it contains a solid legal description for Parcels A, B, and C, and the reservation of "not less than 200 feet of waterfront" does not invalidate the Tricore PSA. The reservation references Bonner County Planning and Zoning provisions, which are admissible to sufficiently identify the property being reserved. Thus, we hold the Tricore PSA satisfies the statute of frauds and that the district court properly dismissed the statute of frauds defense on summary judgment.

**B.      The Tricore PSA is a valid and enforceable contract and the Estate breached the Tricore PSA when it sold the Warren Property to Stockton and Brinkmeyer.**

On Tricore's breach of contract claim, the district court found the Tricore PSA constituted a valid and enforceable contract. The district court found there was a meeting of the minds between the Estate and Tricore as to all material terms of the sale. The district court also held the Estate failed to prove Tricore repudiated the Tricore PSA. As a result, the district court ultimately held the Estate breached the Tricore PSA by selling the Warren Property to Stockton and Brinkmeyer.

The Estate argues the district court erred in finding it breached the Tricore PSA. The Estate maintains the Tricore PSA did not constitute a valid, enforceable contract because there was no meeting of the minds on two material terms: 1) whether the sale included 318-feet of waterfront property; and 2) whether the two hundred feet reserved for the Estate would ever transfer title during the development process. Alternatively, the Estate argues even if the Tricore PSA is enforceable, the district court erred in finding Tricore did not repudiate.

1.    The Estate and Tricore had a meeting of the minds on all material terms.

"In order for a contract to be formed there must be a meeting of the minds. A meeting of the minds is evidenced by a manifestation of intent to contract which takes the form of an offer and acceptance." *Unifund CCR, LLC v. Lowe*, 159 Idaho 750, 754, 367 P.3d 145, 149 (2016) (quoting *Barry v. Pac. W. Constr., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004)). "The meeting of the minds must occur on all material terms to the contract." *Barry*, 140 Idaho at 831, 103 P.3d at 444 (internal quotations omitted). "The material terms which must be identified in a

15

contract to convey land include the parties to the contract, the subject matter of the contract, the price or consideration, and a description of the property." *Bear Island Water Ass'n, Inc. v. Brown*, 125 Idaho 717, 722, 874 P.2d 528, 533 (1994). "Whether there was a meeting of the minds is an objective inquiry that does not focus on the subjective beliefs or intentions of [the parties]." *Brunobuilt, Inc. v. Strata, Inc.*, 166 Idaho 208, 217, 457 P.3d 860, 869 (2020).

"For a land sale contract . . . the contract must typically contain the minimum provisions of the parties involved, the subject matter thereof, the price or consideration, a description of the property, and all the essential terms of the agreement." *P.O. Ventures, Inc. v. Loucks Fam. Irrevocable Tr.*, 144 Idaho 233, 238, 159 P.3d 870, 875 (2007). The Tricore PSA identifies the Estate and Tricore as the parties. It identifies the property as three separate parcels, each with legal descriptions undisputed by the parties, and identifies the total acreage being sold. The purchase price is $2,400,000, with $20,000 in required earnest money. The closing date was set for September 9, 2016. Last, the Estate and Tricore signed the Tricore PSA. Despite the Estate's contentions, the Tricore PSA includes all the essential material terms of a land sale contract. *See P.O. Ventures*, 144 Idaho at 238, 159 P.3d at 875.

Even so, the Estate argues there was no meeting of the minds due to mutual mistake because Mort believed the sale included 318-feet of waterfront property at the east end of the property and the Estate knew that the Tricore PSA did not include as much. The Estate thus argues there was a mutual mistake between the parties.

"To establish mutual mistake, '[t]he mistake must be common to both parties.' " *Bolognese v. Forte*, 153 Idaho 857, 863, 292 P.3d 248, 254 (2012) (quoting *O'Connor v. Harger Constr., Inc.*, 145 Idaho 904, 909, 188 P.3d 846, 851 (2008)). "A mutual mistake occurs when both parties, at the time of contracting, share a misconception regarding a basic assumption or vital fact upon which the bargain is based." *Hughes v. Fisher*, 142 Idaho 474, 482, 129 P.3d 1223, 1231 (2005). "Under Idaho law, a mutual mistake permits a party to rescind or modify a contract as long as the mistake is so substantial and fundamental as to defeat the object of that party." *Bolognese*. 153 Idaho at 865, 292 P.3d at 256.

Here, there is no evidence of mutual mistake. Finney testified "that the Estate understood [the 318-feet] was always not in the contract, Mr. Mort always understood that [the 318-feet] was in the contract." The Estate knew the 318-feet of waterfront was not included in the Tricore PSA based on the Tricore PSA's legal description and its understanding of the property. But Mort's

16

misunderstanding does not create a mutual mistake; there was no mutual mistake because the mistake was not common to both parties; the Estate knew exactly what it was selling to Tricore.

At most, Mort's misunderstanding constitutes a unilateral mistake. But "[a] party to a contract 'who makes a mistake unilaterally cannot rescind or modify the agreement absent' misrepresentation or knowledge of the mistake by the other party." *Cline v. Hoyle & Assocs. Ins., Inc.*, 108 Idaho 162, 164, 697 P.2d 1176, 1178 (1985) (quoting *Cohen v. Merrill*, 95 Idaho 99, 104, 503 P.2d 299, 304 (1972)). Pointedly, Tricore, the party who made the mistake, is not the party seeking to rescind or modify the Tricore PSA. Even so, Mort testified that Tricore, when it entered into the Tricore PSA, thought it was purchasing all waterfront property but later discovered the Tricore PSA excluded 318-feet of waterfront located at the east end of the property. Mort explained that Tricore "knew [it was] purchasing a legal description, but [it] thought based upon what . . . [it was] told[,] that [it was] purchasing all the waterfront." Later, after the earnest money became nonrefundable and the contract became "hard,"[4] Tricore received a revised plat map of the Warren Property and it was then that Mort discovered the Tricore PSA did not include 318-feet of waterfront at the east end of the property. Mort's testimony provides that there was no misrepresentation by the Estate and there is no evidence that the Estate knew Mort did not understand what he was contracting for when the parties entered into the Tricore PSA. Thus, even though Mort sought to rework the contract after his discovery, that fact is not sufficient to undo the contract. We hold there was substantial and competent evidence that the Estate and Tricore agreed on all material terms and that the district court did not err in finding the Tricore PSA constituted a valid and enforceable contract.

2. Tricore did not repudiate the Tricore PSA.

Where a valid and enforceable contract exists imposing contractual duties on the parties to the contract, a wronged party may raise as a defense the doctrine of anticipatory repudiation. *See Trumble*, 166 Idaho at 137, 456 P.3d at 216. "The Supreme Court has stated that to repudiate a contract, a party must make 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.' " *Minidoka Irr. Distr. v. Dep't of Interior of U.S.,* 154 F.3d 924, 926 (9th Cir. 1998) (quoting *Dingley v. Oler*, 117 U.S. 490, 502

---

[4] In real estate parlance, a contract "goes hard" when a due diligence period ends, meaning that the buyer will lose its earnest money deposit if it does not close.

(1886)). "A repudiating party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Trumble*, 166 Idaho at 137, 456 P.3d at 216 (internal quotations omitted).

At the time the Appellants closed on the Stockton PSA, the three also entered into an indemnification agreement. The indemnification agreement provided:

> WHEREAS *Sellers have entered into a contract to sell the [Warren] Property to Tricore Investments, LLC*, an Idaho limited liability company, for $2,400,000, plus additional considerations (hereinafter, the "Warren-Tricore PSA");
>
> . . . . [and]
>
> WHEREAS *Sellers have agreed to repudiate their obligations under the Warren-Tricore PSA* upon the execution of this Indemnification Agreement, which repudiation shall be in writing and delivered to the third party named in the Warren-Tricore PSA within two (2) calendar days; [and]
>
> WHEREAS *Sellers' repudiation of their obligations under the Warren-Tricore PSA* may expose Sellers to liability for a breach of the Warren-Tricore PSA[.]

(Emphasis added). The indemnification agreement alone dispenses with the Estate's argument that Tricore repudiated. This agreement provides more than substantial evidence that the Estate—not Tricore—was the party repudiating the agreement. The Appellants acknowledged the existence of the Tricore PSA and that it was the *Appellants' agreement* for the Estate to repudiate its own obligations under the valid and existing Tricore PSA that lead to the breach found by the district court.

Beyond that, Tricore's actions in attempting to renegotiate the original contract were not "sufficiently positive to be reasonably interpreted to mean that [Tricore would] not or [could not] perform." *Trumble*, 166 Idaho at 137, 456 P.3d at 216. Even so, Finney held a firm belief that Tricore repudiated on August 9, 2016, and he testified accordingly. However, Tricore's overtures about changing the deal to account for the mistaken 318-feet of waterfront property did not amount to a refusal to perform; Tricore continued to pursue development of the property well after August 9, 2016. Indeed, on August 15, 2016, Mort emailed Bonner County Commissioner, Milton Ollerton, in which Mort proposed a meeting to "discuss a project that [Tricore is] entertaining on the south end of Priest Lake." On August 16, 2016, Mort emailed Drew Dittman, the engineer Tricore had employed, about further assessments of the property, particularly the waterfront. Also on August 16, 2016, after discovering the Tricore PSA did not include the 318-feet of waterfront located at the east end of the property, Mort sent Lempesis a letter discussing options on how to

18

"move the project forward." In that email Mort stated Tricore was "still in the process of our Wetland Biologist and Engineer doing the wetlands delineation and assessment on the property . . . ." The letter also proposed:

> 1) $2.1 million purchase price[.]
> 2) Seller to grant to buyer existing water system and all water rights to the property.
> 3) Seller to grant to buyer any necessary easement's [sic] needed for all utilities and access to the property[.]
> 4) Seller to allow buyer up to 160,000 yards of sand/structural fill material (buyer to haul from buyers pit property)[.]
> 5) Buyer to deposit additional $10,000 nonrefundable Property closing shall be extended to 12/31/16[.]

Mort testified that these terms were proposed "to negotiate based upon the waterfront not being there the way [Tricore] thought." Offering a counterproposal after an agreement has been reached does not amount to a repudiation. Indeed, such ongoing discussions are simply that–discussions– which, without more, do not come close to "a positive, unconditional, and unequivocal declaration," *Minidoka Irr. Distr.,* 154 F.3d at 926, required to amount to a repudiation of the Tricore PSA.

After proposing the above options, Mort continued to communicate with key players in developing the property, particularly Dittman, Tom Duebendorfer and Commissioner Ollerton. In fact, even after receiving Finney's letter on September 6, 2016, where the Estate informed Tricore it was proceeding in a different direction, Tricore continued to pursue purchasing the property under the Tricore PSA. These facts do not support a finding of repudiation. Rather, as the district court found, Tricore was at all times ready, willing and able to close on the Tricore PSA. Thus, we affirm the district court's finding that Tricore did not repudiate the Tricore PSA.

### C.     The Estate violated the ICPA.

The district court found the Estate's actions were misleading and deceptive in violation of the ICPA. Specifically, the court found the Estate acted in a misleading and deceptive manner when it lead Tricore to believe the parties were moving forward with the Tricore PSA without mentioning the ongoing negotiations and eventual sale of the Warren Property to Stockton and Brinkmeyer. On appeal, the Estate maintains that because the Tricore PSA is not a valid, enforceable contract, there can be no ICPA claim against it. In the alternative, the Estate argues the ICPA claim must fail because its refusal to schedule a meeting as requested by Mort does not constitute unfair or unconscionable behavior.

19

"The purpose of the [ICPA] is to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." I.C. § 48-601. "[T]he Act must be liberally construed to effect the legislative intent." *Pierce v. McMullen*, 156 Idaho 465, 474, 328 P.3d 445, 454 (2014). Acts or practices declared unlawful by the ICPA include "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." I.C. § 48-603(17). "[P]roof of intention to deceive is not required for finding that an act is unfair or deceptive." *Duspiva v. Fillmore*, 154 Idaho 27, 32, 293 P.3d 651, 656 (2013). "[T]he offending party must be a person who 'knows, or in the exercise of due care should know, that he has in the past, or is' committing an act or practice declared unlawful by Idaho Code section 48-603." *Swafford v. Huntsman Springs, Inc.*, 163 Idaho 209, 213, 409 P.3d 789, 793 (2017) (quoting I.C. § 48-603). "[C]laims brought under the ICPA must be based on a contractual relationship." *Doble v. Interstate Amusements, Inc.*, 160 Idaho 307, 309, 372 P.3d 362, 364 (2016*); see also Taylor v. McNichols*, 149 Idaho 826, 846, 243 P.3d 642, 662 (2010) ("In order to have standing under the [ICPA], the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively.").

A simple timeline establishes the substantial evidence supporting the district court's conclusion that the Estate engaged in misleading and deceptive behavior. On September 1, 2016, Lempesis texted Finney requesting a meeting. On September 2, 2016, the Estate entered into the Stockton PSA. In addition, on September 2, Finney emailed Lempesis letting him know he could not schedule a meeting as requested. Yet, in that email, Finney did not tell Lempesis that the Estate had entered into the Stockton PSA. Despite its many attempts, Tricore was unable to schedule any other meeting with the Estate. As Mullen testified, there was "radio silence" from the Estate. On September 6, 2016, the Estate closed on the Stockton PSA around 3:30 P.M. Then, that same day around 4:30 P.M., Finney emailed Mullen and Lempesis informing them that the Estate had decided to "proceed in a different direction." Even after the Estate closed on the Stockton PSA, Tricore was not informed that the Estate had sold the Warren Property to other buyers. In fact, it was not until Tricore, in checking with its title company to determine the status of the sale, discovered that the Estate had sold the Warren Property to Stockton and Brinkmeyer. Until that time, as the district court found, believing it was under contract to purchase the property, Tricore remained ready to close on the Tricore PSA despite its reservations about the 318-feet of waterfront

20

property. The Estate's actions led Tricore to believe it was under contract and it would be purchasing the Warren Property. At the same time, the Estate, in actuality, was colluding with Stockton and Brinkmeyer to sell the Warren Property by repudiating the Tricore PSA. Because we have previously held that the Tricore PSA was a valid and enforceable contract, substantial and competent evidence supports the district court's conclusion that the Estate violated the ICPA by misleading Tricore to believe it was proceeding with closing of the Tricore PSA when the Estate, in fact, was not going to close.

## D. Stockton and Brinkmeyer tortiously interfered with the Tricore PSA and their interference was unjustified.

The district court found Stockton and Brinkmeyer tortiously interfered with the Tricore PSA.[5] The district court also found that Stockton and Brinkmeyer's interference was not justified by Stockton's purported right of first refusal. On appeal, Stockton and Brinkmeyer argue that the district court erred in finding they tortiously interfered with the Tricore PSA because the Tricore PSA is not a valid and enforceable contract. In the alternative, Stockton and Brinkmeyer argue the district court erred in finding they tortiously interfered with the Tricore PSA because their intentions were proper, and they were justified in purchasing the Warren Property.

"One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability. . . ." *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 895, 243 P.3d 1069, 1083 (2010) (quoting RESTATEMENT (SECOND) OF TORTS § 766 (1979)). "Tortious interference with contract has four elements: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Id.* (quoting *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616, 624 (2008)). "A plaintiff may show the defendant's interference with another's contractual relation is intentional if the actor desires to bring it about or 'if he knows that the interference is certain or substantially certain to occur as a result of his

---

[5] Tricore asserts there is enough evidence before this Court to find Stockton and Brinkmeyer also tortiously interfered with a valid business expectancy. The district court did not make any findings on this claim. Tricore does not assign error to the district court's failure to address the business expectancy claim. Therefore, Tricore waived the claim on appeal. *See Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) ("[T]o the extent that an assignment of error is not argued and supported in compliance with the I.A.R., it is deemed to be waived.").

action.' " *BECO Constr. Co., Inc., v. J-U-B Eng'rs, Inc.*, 145 Idaho 719, 723, 184 P.3d 844, 848 (2008) (quoting *Highland Enter., Inc., v. Barker*, 133 Idaho 330, 340, 986 P.2d 996, 1006 (1999)).

1. Existence of the Tricore PSA.

We affirm the district court's finding that the Tricore PSA was a valid and enforceable contract. As a result, we hold the first element of tortious interference with contract, the existence of a contract, is satisfied. *See Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083.

2. Stockton and Brinkmeyer's knowledge of the Tricore PSA.

To satisfy the second element of a tortious interference with contract claim, the plaintiff must show the defendant had knowledge of the contract. *Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083. Here, the indemnification agreement clearly discloses Appellants' had knowledge of the existence of the Tricore PSA. The Tricore PSA was also disclosed to Stockton and Brinkmeyer at the meeting held on September 2, 2016, between the Estate, Stockton, and Brinkmeyer and in the draft documents provided to Stockton and Brinkmeyer prior to this meeting.

The record also establishes that both Stockton and Brinkmeyer knew Tricore was purchasing the Warren Property and planning to develop it. Mort testified that he and Brinkmeyer met on August 17, 2016, where Mort told Brinkmeyer he made an offer on the Warren Property, showed Brinkmeyer an aerial map of the Warren Property, and showed Brinkmeyer a diagram of the proposed development. Stockton testified that he discovered the Estate was selling some of the property to a developer at a neighborhood meeting held on August 20, 2016. During the meeting, Cheryl Moody (with the Selkirk Conservation Alliance) gave a presentation. In a follow-up email on August 28, 2016, Moody sent Stockton a list of proposals to "get some control of the property/situation" as Moody had "promised" Stockton. In that email, Moody specifically identifies Mort as the buyer. The record establishes Stockton and Brinkmeyer knew about the Tricore PSA. The second element is thus satisfied.

3. Stockton and Brinkmeyer intentionally interfered and caused the Estate to breach the Tricore PSA.

To satisfy the third element of a tortious interference with contract claim, the plaintiff must show the defendant intentionally interfered. *Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083. Interference is intentional when the defendant desires to interfere or knows that the interference is certain or substantially certain to occur. *See BECO Constr. Co.,* 145 Idaho at 723, 184 P.3d at 848. "The 'intent' of the 'intentional interference' requirement can be inferred[.]"

22

*Bybee*, 145 Idaho at 259, 178 P.3d at 624 (quoting *Highland Enter.*, 133 Idaho at 340, 986 P.2d at 1006).

"[F]or liability to arise from intentional interference with another's performance of a contract, that interference must be improper." *BECO Constr. Co.,* 145 Idaho at 723, 184 P.3d at 848. In determining whether the interference is improper, consideration is given to these factors: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interest sought to be advanced by the actor; 5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; 6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Id*. at 723–24, 184 P.3d at 848–49 (citing RESTATEMENT (SECOND) OF TORTS § 767 (1979)).

Once again, there is substantial and competent evidence in this record that Stockton and Brinkmeyer knew that pursuing the purchase of the Warren Property was going to or substantially certain to interfere with the Tricore PSA. Indeed, it cannot be reasonably argued that the primary motivation for Stockton and Brinkmeyer purchasing the property was to prevent Tricore from owning and developing it. After discovering Tricore planned to purchase the Warren Property and develop it, Stockton and Brinkmeyer, as the district court stated, "embarked on a systematic campaign to prevent Tricore from purchasing the property." In trying to "preserve the wetland and to preserve the property," Stockton and Brinkmeyer jointly agreed to purchase the Warren Property. The two met separately with the Estate's co-personal representatives and expressed their interest in purchasing the Warren Property. On August 22, 2016, Brinkmeyer emailed Stockton, listing the legal descriptions included in the Tricore PSA. Stockton responded, "[l]et's talk in the morning about a thought for you and the potential buyer. I have an idea . . . maybe not a good one, but I have one."

On September 2, 2016, Stockton and Brinkmeyer, along with their counsel, met with the Estate. During that meeting, the parties entered into the Stockton PSA, despite knowing Tricore was under contract with the Estate for the Warren Property. Along with the Stockton PSA, the parties entered into an indemnification agreement. The indemnification agreement provided the Estate would repudiate its obligations under the Tricore PSA and sell the Warren Property to Stockton and Brinkmeyer. The parties then rushed to close on September 6, 2016, conveniently, three days before the scheduled closing of the Tricore PSA. These facts, at a minimum, support

23

the district court's conclusion that Stockton and Brinkmeyer intentionally interfered with the Tricore PSA. Thus, the third element is satisfied.

4. Injury to Tricore resulting from the Estate's breach.

The last element of a tortious interference with a contract claim is injury to the plaintiff resulting from the breach. *Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083. First, the breach prevented Tricore from obtaining the unique property it had contracted to purchase. Second, Tricore, up until the breach, had expended significant amounts of money performing due diligence on the Warren Property. Thus, as the district court found, the Estate's breach injured Tricore and the last element is satisfied.

5. Stockton and Brinkmeyer's justification for the interference.

Once a plaintiff has established a prima facie case for tortious interference with a contract, the burden shifts to the defendant to justify its interference. *Wesco Autobody Supply*, 149 Idaho at 895, 243 P.3d at 1083. According to Stockton and Brinkmeyer, their actions were justified based on their belief that Stockton had a valid right of first refusal on the Warren Property.

*a. The district court's exclusion of evidence regarding the alleged right of first refusal under Idaho Code section 9-202(3) and I.R.E. 601(b) was an abuse of discretion but the error was harmless and is affirmed on other grounds.*

In ruling on the parties' numerous motions in limine, the district court granted, in part, Tricore's motion to exclude "[a]ny evidence or argument regarding Stockton's alleged right of first refusal . . . pursuant to the Deadman's Statute and Idaho rules of evidence." The court further explained:

> As a matter of law, to wit: the Deadman's Statute, I.C. § 9-202(3) and I.R.E. 601(b), there is no legally enforceable right of first refusal. The Court will not allow any hearsay statements allegedly made by Bill Warren, deceased, or by Mr. Brinkmeyer's mother. *However, this testimony is potentially relevant (and may be allowed) on the issue of Stockton's and Brinkmeyer's intent as it relates to the plaintiff's claims for tortious interference.*

(Emphasis added).

"Trial courts have broad discretion when ruling on a motion in limine." *Wilson*, 167 Idaho at 64, 467 P.3d at 428 (quoting *Gunter v. Murphy's Lounge, LLC*, 141 Idaho 16, 25, 105 P.3d 676, 685 (2005)). In reviewing an alleged abuse of discretion, this Court asks whether the district court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices

24

available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

Idaho Code section 9-202 prohibits certain persons from testifying as witnesses. *See also Slavens v. Slavens*, 161 Idaho 198, 203, 384 P.3d 962, 967 (2016) (referring to section 9-202(3) as the "Deadman's Statute"). Section 9-202, in relevant part, provides that the following persons cannot be witnesses:

> Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any communication or agreement, not in writing, occurring before the death of such deceased person.

I.C. § 9-202(3). "I.R.E. 601(b) is virtually identical to I.C. § 9-202(3)." *April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 515, 328 P.3d 480, 495 (2014) (footnote omitted). Thus, "this Court applies the same analysis to the evidentiary rule and the [Deadman's] statute." *Id*. Critically, these rules do not apply when testimony is being offered to defend against a claim. *Lunders v. Estate of Snyder*, 131 Idaho 689, 699, 963 P.2d 372, 382 (1998) (citing *Lowry v. Ireland Bank*, 116 Idaho 708, 711 n.1, 779 P.2d 22, 25 n.1 (Ct. App. 1989)).

First, Stockton and Brinkmeyer claim the Deadman's Statute and I.R.E. 601(b) do not apply here. They are correct. Stockton sought to introduce evidence of Bill Warren's oral communications about granting Stockton a right of first refusal–communications that occurred before Bill Warren's death. That evidence was not offered *against* the Estate. Rather, the evidence was offered as a defense to Tricore's tortious interference claim since Stockton and Brinkmeyer were alleging their interference was justified based on the alleged right of first refusal. Because the evidence was being offered to defend against a claim, the district court abused its discretion in misapplying the appropriate legal standard. The district court prohibited Appellants from offering such evidence under section 9-202(3) and I.R.E. 601(b), respectively. Despite making that ruling in limine, however, the district court recognized that the evidence could be admissible for another purpose. Thus, the error was harmless because testimony about the right of first refusal *was admitted* at trial to establish whether Stockton and Brinkmeyer intended to interfere with the Tricore PSA.

Still, Stockton and Brinkmeyer maintain the district court's ruling that the Deadman's Statute and I.R.E. 601(b) rendered the right of first refusal legally unenforceable was an error that infected the entire tortious interference claim. "When the trial court reaches the correct result by

an erroneous theory, we will affirm the result on the correct theory." *Nicholson v. Coeur D'Alene Placer Mining Corp.*, 161 Idaho 877, 881, 392 P.3d 1218, 1222 (2017). The district court's ruling that the Deadman's Statute rendered the right of first refusal unenforceable was erroneous. *See Slavens*, 161 Idaho at 203, 384 P.3d at 967. Even so, Stockton and Brinkmeyer's claims that this ruling contaminated the entire trial on this question is not supported in this record. We will affirm the district court's ruling that the alleged right of first refusal was unenforceable on other grounds.

First, we must address Tricore's argument that Stockton waived any alleged right of first refusal. "A right of first refusal is '[a] potential buyer's contractual right to meet the terms of a third party's offer if the seller intends to accept that offer.' " *Nicholson*, 161 Idaho at 881, 392 P.3d at 1222 (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)). "Before accepting a bona fide offer of a third person, the owner must give the [holder of the right of first refusal] an opportunity to buy at the price so offered." *Meridian Bowling Lanes, Inc. v. Meridian Athletic Ass'n, Inc.*, 105 Idaho 509, 512, 670 P.2d 1294, 1297 (1983). "[T]he holder of such a right of first refusal cannot be called upon to exercise or lose that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision." *Gyurkey v. Babler*, 103 Idaho 663, 666, 651 P.2d 928, 831 (1982) (emphasis in original). Applied in most transactions, a seller receives a written offer that sets forth the terms and conditions of the offer. *Id.* "The preemptor, under a right of first refusal requiring acceptance on the same terms and conditions, is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror." *Id.*

Even if the right of first refusal is enforceable, the Estate, before it accepted the Tricore PSA that set forth the final terms, had to offer Stockton the same terms. *See id.* The Estate's prior offers to Stockton did not meet these requirements. On May 20, 2014, Finney emailed Stockton informing Stockton that the Estate was interested in selling a portion of its property. There, Finney explained the Estate was interested in selling Parcel B for approximately $5,200,000. Years before the Tricore PSA, on May 29, 2015, Finney again emailed Stockton asking if he would be interested in purchasing any of the property. Finney explained the Estate would list the property at "a purchase price closer to the range you indicated you were comfortable with last year for Elaine's house parcel." Stockton declined both offers. After listing the property, the Estate eventually entered into the Tricore PSA. The Tricore PSA lists a purchase price of $2,400,000, an amount much different from what Finney originally suggested to Stockton. More, the Tricore PSA added acreage to the transaction, as the Warren Property included Parcels A, B, and C, totaling about

26

sixty-five acres. Before entering into the Tricore PSA, the Estate never offered these terms to Stockton. As a result, Stockton did not waive any alleged right of first refusal by declining earlier, but different offers from the Estate.

Even so, we hold no valid right of first refusal exists. Idaho Code section 9-505 requires certain agreements to be in writing and signed by the parties. "An agreement that by its terms is not to be performed within a year from the making thereof" falls under the statute of frauds. I.C. § 9-505(1). Agreements for an interest in real property clearly fall under the statute of frauds. *Id*. at 9-505(4). "Like any contract for the sale of land, an oral agreement must be complete, definite, and certain in all its terms, or contain provisions which are capable in themselves of being reduced to certainty[.]" *Nicholson*, 161 Idaho at 882, 392 P.3d at 1223 (internal quotations omitted). "The description of the real property must adequately describe the property so that it is possible for someone to identify exactly what property the seller is conveying to the buyer." *Id*. (internal quotations omitted). "The statute of frauds does not prevent the creation of an oral contract but precludes the contract's enforcement." *Treasure Valley Gastroenterology Specialists, P.A. v. Woods*, 135 Idaho 485, 489 n.1, 20 P.3d 21, 25 n.1 (Ct. App. 2001).

Here, Stockton purchased a piece of Bill Warren's property in 1990. Before the sale closed, Bill Warren asked Stockton to move the property-line to accommodate another sale. In return, Stockton allegedly received "[a] right of first refusal on *future* sales" of "*any* Warren family property." (Emphasis added). Because the alleged agreement was for the sale of land and lasted indefinitely, it had to be in writing pursuant to Idaho Code sections 9-505(1) and (4). Stockton testified the agreement was not in writing but was like "a handshake deal." A handshake deal concerning an interest in real property does not satisfy the statute of frauds. More, the agreement required a description of the property that was subject to the right of first refusal. *Nicholson*, 161 Idaho at 882, 392 P.3d at 1223. Stockton first testified that the right of first refusal was for *any* Warren property. Later, Brinkmeyer testified that the right of first refusal was for "*every waterfront property* [the Warrens] had to sell." (Emphasis added). This confusion, even between these co-defendants, supports why such an agreement must be in writing. A description of the real property subject to the right of first refusal did not exist. Therefore, the district court did not err in ruling that the alleged right of first refusal was unenforceable.

>   b. *A valid and enforceable right of first refusal did not exist and, thus, Stockton and Brinkmeyer's interference with the Tricore PSA was unjustified.*

27

Stockton and Brinkmeyer maintain that their view of the right of first refusal justified their interference with the Tricore PSA and that the district court erred in finding otherwise. The district court concluded Stockton and Brinkmeyer failed to establish the defense of justification. The district court explained:

> The argument that either Stockton or Brinkmeyer reasonably believed that Stockton possessed any legitimate right of first refusal to purchase the 65 acres is ludicrous. Bill Warren died in 1992. Elaine Warren died in 2003. There is nothing in writing giving Stockton any right to any portion of the property. Stockton and Brinkmeyer are sophisticated, experienced businessmen. Both testified to routinely buying and selling property worth millions of dollars. Both have been advised and represented by competent legal counsel since the day they partnered to acquire the 65 acres. Any competent attorney would have immediately informed them that Stockton's so-called right of first refusal was invalid.

The district court's sentiments about the right of first refusal may be harsh, but its findings are supported by substantial and competent evidence.

Stockton's alleged right of first refusal was not in writing but was "like a handshake deal." Stockton, supported by Brinkmeyer and Chris and Dan Warren, testified that the families all acknowledged the existence of the right of first refusal. Thus, Stockton and Brinkmeyer argue the right of first refusal existed since all parties performed as promised.

In asserting as much, Stockton and Brinkmeyer argue Tricore lacks standing to challenge the validity of the right of first refusal and cite *Frantz v. Parke*, 111 Idaho 1005, 729 P.2d 1068 (Ct. App. 1986), *Mikesell v. Newworld Dev. Corp.*, 122 Idaho 868, 840 P.2d 1090 (Ct. App. 1992), and *Nicholson*, 161 Idaho 877, 392 P.3d 1218, in support. None of these cases are directly on point. *See Nicholson,* 161 Idaho at 882, 392 P.3d at 1223 (holding an oral right of first refusal was too vague to be enforced); *see Mikesell*, 122 Idaho at 874, 840 P.2d at 1096 (imputing the doctrine of part performance to a seller's successor in title); s*ee Franz*, 111 Idaho at 1006, 729 P.2d at 1069 (analyzing the enforceability of an oral non-compete agreement between an employer and former employee by applying the doctrine of part performance). These cases do not support the claim that Tricore has no basis to argue against Stockton and Brinkmeyer's claims of justification.

Beyond that, the record does not support a finding that a right of first refusal existed. In the email Finney sent to Stockton on May 20, 2014, in which Finney informed Stockton of the Estate's intent to sell the property, Finney did not mention any right of first refusal. There, Finney explained that the two had spoken previously and "[a]s [Finney] indicated on the phone, the Estate w[anted] to determine [Stockton's] interest in purchasing based upon past conversations and [wanted] to

28

work with [Stockton] prior to putting any of the property officially on the market." In an email Finney sent to Mullen on September 2, 2014, Finney explained "[t]he Warrens have given a neighbor a *first look* at the property" but did not mention any right of first refusal. (Emphasis added). On May 29, 2014, Finney again emailed Stockton about selling the property but again never mentioned any right of first refusal. Instead, Finney stated: "*[a]s a courtesy*, I wanted to let you know that Chris and Dan Warren as Personal Representatives of the [Estate] are in the process of listing the real property . . . ." (Emphasis added).

More, the Estate never disclosed any historical information about the alleged right of first refusal even though such disclosures are standard practice. The title report issued pursuant to the first purchase and sale agreement between the Estate and Tricore contained no reference to any right of first refusal. In fact, Finney testified he was confident there was never any written right of first refusal. Finney further testified that if there had been a right of first refusal, he would have included that information in the Tricore PSA. The Estate also did not disclose a right of first refusal to Tricore before the parties entered into the Tricore PSA.

Stockton and Brinkmeyer argue that the district court's findings of fact acknowledge the existence of the alleged right of first refusal and that those findings are binding here because Tricore assigned no error to the district court's factual findings. The district court's factual findings provided:

> In 1989, Stockton was negotiating to purchase lakefront from the Warrens, adjacent to the Brinkmeyers' property. During the negotiations, Stockton agreed to move his property line to the east to allow the Warrens to sell additional lakefront property to the Brinkmeyers. In exchange for this concession, *Bill and Elaine Warren promised to give Stockton the first right to purchase any additional Priest Lake Property they offered for sale*.
> The *first right to purchase* was never reduced to writing. *There is nothing of record indicating that any of the Estate's real property is subject to a right of first refusal*. . . . Both Dan and Chris were aware of their *parents' promise to Stockton*.

(Emphasis added).

"The rule of law is well-settled in this state that a trial court's findings of fact to which the appellant has not specified as an issue, i.e., assigned as error, will not be considered on appeal." *Cox v. Mtn. Vistas, Inc.*, 102 Idaho 714, 719 n.4, 639 P.2d 12, 17 n.4 (1981); *see also Lockridge v. Amalgamated Ass'n of St., Elec. Ry. And Motor Coach Emp. of America*, 93 Idaho 294, 304, 460 P.2d 719, 729 (1969) ("After the trial on the merits, the trial court made certain findings of fact to

29

which appellant has made no assignments of error on appeal and therefore such findings are necessarily binding on this [C]ourt."). Contrary to Stockton and Brinkmeyer's assertions, however, the district court did not find a valid and enforceable right of first refusal. Instead, the district court acknowledged a promise by the late Warrens to Stockton for purchasing Warren property in the future. A mere promise to sell land in the future to a specific buyer falls far short of creating a valid and enforceable right of first refusal. *See Gyurkey*, 103 Idaho at 666, 651 P.2d at 931 (applying the same basic principles of contract law to rights of first refusals). More, we "liberally construe the trial court's findings of fact in favor of the judgment entered." *Alsco*, 166 Idaho at 523, 461 P.3d at 805. The district court ultimately held that a valid right of first refusal did not exist. Thus, we construe the district court's findings about the Estate's promise to sell land to Stockton as just that, a mere promise, not a valid and enforceable right of first refusal.

In summary, there is substantial and competent evidence supporting the district court's finding that a valid and enforceable right of first refusal did not exist. Thus, an alleged "handshake deal" is insufficient to show that the district court erred in failing to find justification for the tortious interference. To be enforceable, and to form the basis for justification for Stockton and Brinkmeyer's actions, the underlying right of first refusal had to be valid, in writing, and it had to include precise descriptions of what the right entailed. We affirm the district court's finding that Stockton and Brinkmeyer were not justified in their interference with the Tricore PSA.

**E.      The Estate, Stockton, and Brinkmeyer did not engage in a civil conspiracy.**

The district court found a conspiracy existed involving the Estate, Stockton, and Brinkmeyer. In its initial order on the civil conspiracy claim, the district court found: "there was an agreement between the defendants to accomplish an unlawful objective, i.e., interference with the [Tricore PSA], resulting in the breach of the [Tricore PSA], and damage, i.e., loss of the property by Tricore." The district court later clarified its ruling on the unlawful objective giving rise to the conspiracy claim, stating its original decision was "inartful" and did not "accurately reflect that all of the defendants were found to have engaged in the conspiracy." The district court clarified, "there was an agreement between all of the defendants to accomplish an unlawful objective, i.e., for the Estate to breach the [Tricore PSA] to facilitate the purchase of the property by Stockton [and] Brinkmeyer[.]"

The Estate, Stockton, and Brinkmeyer argue the district court erred in finding they engaged in a civil conspiracy. Again, Appellants argue the Tricore PSA is not a valid, enforceable contract.

30

Relying on that position, Appellants argue there can be no claim for civil conspiracy because there is no underlying wrong. Inasmuch as we have already found this argument unsupportable, it is inadequate to reinforce the Appellants' argument as to the civil conspiracy.

In the alternative, Appellants argue the district court erred in finding they engaged in a civil conspiracy because the Estate cannot tortiously interfere with its own contract and Stockton and Brinkmeyer cannot breach a contract they are not a party to. The Appellants have a point on these grounds.

As an initial matter, Tricore argues this Court should dismiss the Appellants' argument on whether a party can tortiously interfere with its own contract because the Appellants did not argue as much below. We have held that "so long as a substantive issue is properly preserved, a party's appellate argument may evolve on appeal." *State v. Hoskins*, 165 Idaho 217, 224, 443 P.3d 231, 238 (2019). Metaphorically, a party riding a horse into the appellate process that has been groomed and reshod for the appeal is not only permitted but expected. *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). An argument is only precluded when the party rides in on an entirely different horse. *Id.* Here, whether Appellants engaged in a civil conspiracy was an issue raised and ruled on below. The Appellants have continually argued they did not engage in a civil conspiracy. Thus, the Appellants have simply groomed, reshod, and readied their horse up for this Court. Thus, we will address the merits of the Appellants' arguments as they relate to the civil conspiracy finding.

"A civil conspiracy that gives rise to legal remedies exists only if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner." *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317, 321 (2003). A civil conspiracy is not, on its own, a claim for relief. *Id.* Rather, a civil conspiracy "is the civil wrong committed as the objective of the conspiracy, not the conspiracy itself." *Id.* Conspiracy is only material for the purpose of "making all of the defendants liable for each individual act of the other defendants, if the conspiracy is established." *Dahlquist v. Mattson*, 40 Idaho 378, 393, 233 P. 883, 887 (1925).

Although this Court is not bound by the holdings of other jurisdictions, the benchmark governing civil conspiracy explained in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994), is instructive. There, the California Supreme Court explained that civil conspiracy is "a legal doctrine that imposes liability on persons who, although not actually

31

committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment*, 869 P.2d at 510–11. "By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Id.* at 511. As a result, if the underlying wrong is tortious interference, and the Estate owes no duty to itself, it cannot commit that tort; accordingly, it is also unable to engage in a conspiracy with Stockton and Brinkmeyer to commit that same tort. *See Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 123 Idaho 650, 654, 851 P.2d 946, 950 (1993) ("The general rule is that a party cannot tortiously interfere with its own contract.").

Alternatively, if the underlying wrong is the Estate's breach of contract, Stockton and Brinkmeyer cannot breach a contract to which they are not a party. *See Vickers v. Hanover Const. Co., Inc.*, 125 Idaho 832, 834, 875 P.2d 929, 931 (1994) ("There is no dispute that the parties to the contract were Hanover and Huntington. Although Claimants maintain this contract created a duty to Vickers, it is undisputed that Vickers was not a party to the agreement."); *see also Fuchs v. Lloyd*, 80 Idaho 114, 122–23, 326 P.2d 381, 386 (1958) ("There is no basis upon which the formation of a contract with respondent could be had in this agreement because the agreement is between [two other parties]."). As a result, the tortious interference claim covers their misdeeds, and they cannot be held responsible for also engaging in a conspiracy to breach a contract with the Estate based on those same misdeeds. Therefore, we reverse the district court's finding that Appellants engaged in a civil conspiracy.

## F. The district court abused its discretion by awarding Tricore attorney fees against Appellants on a joint and several basis.

In its decision and order on the bench trial, the district court found: 1) the Estate breached the Tricore PSA; 2) the Estate violated the ICPA; 3) Stockton and Brinkmeyer tortiously interfered with the Tricore PSA: and 4) the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy. Based on the conspiracy finding, the district court found Tricore was entitled to fees on a joint and several basis. The district court then awarded Tricore fees for $494,431.11, pursuant to the Tricore PSA, Idaho Code section 12-120(3), and the ICPA.

Appellants argue the district court abused its discretion in awarding Tricore attorney fees against them on a joint and several basis. According to Stockton and Brinkmeyer, Tricore is not entitled to fees against them because fees cannot be awarded for tortious interference with contract.

32

Moreover, Stockton and Brinkmeyer argue they are not parties to the Tricore PSA, and they did not engage in a civil conspiracy that would make them liable for the Estate's breach of the Tricore PSA. Thus, Appellants argue the award was error because Tricore failed to apportion fees incurred against Stockton and Brinkmeyer from fees incurred against the Estate. We agree.

"In any civil action the court may award reasonable attorney fees . . . to the prevailing party or parties . . . when provided for by any statute or contract." I.R.C.P. 54(e)(1). "A party claiming attorney's fees must assert the specific statute, rule, or case authority for its claim." *Alsco*, 166 Idaho at 533, 461 P.3d at 815 (quoting *Eighteen Mile Ranch, LLC v. Nord Excavating & Paving, Inc.*, 141 Idaho 716, 720, 117 P.3d 130, 134 (2005)). The prevailing party is determined "from an overall view, not a claim-by-claim analysis." *Syringa Networks, LLC v. Idaho Dep't of Admin.*, 159 Idaho 813, 831, 367 P.3d 208, 226 (2016).

The district court, in awarding fees, stated: "[h]aving found a civil conspiracy amongst all the defendants, the judgment against the defendants for said costs and attorney's fees shall be joint and several." As noted above, we now hold the district court erred in finding the Appellants engaged in a civil conspiracy. Thus, the district court's award against Stockton and Brinkmeyer is unsupported because Stockton and Brinkmeyer were solely liable on the tortious interference claim. Attorney fees are not recoverable under section 12-120(3) for tortious interference with a contract. *Bybee*, 145 Idaho at 260–61, 178 P.3d at 625–26 ("Tortious interference with contract . . . . are torts and not actions to recover on a contract."); *see also NW Bec-Corp. v. Home Living Serv.*, 136 Idaho 835, 842, 41 P.3d 263, 270 (2002) (holding a party has no right to attorney fees under section 12-120(3) for tortious interference with contract). Thus, we vacate the district court's attorney fee award against Stockton and Brinkmeyer.

As for the Estate, the district court's basis for awarding fees was the Tricore PSA, Idaho Code section 12-120(3), and the ICPA. First, "[w]here there is a valid contract between parties which contains a provision for an award of attorney fees and costs, the terms of that contractual provision establish a right to an award of attorney fees and costs." *Humphries v. Becker*, 159 Idaho 728, 739, 366 P.3d 1088, 1099 (2016) (quoting *Farm Credit of Spokane v. W.W. Farms, Inc.*, 122 Idaho 565, 569, 836 P.2d 511, 515 (1992)). "[A]ttorney's fees . . . can be awarded to a prevailing party pursuant to a purchase and sale agreement." *Id.* The Tricore PSA provides "the prevailing party shall be entitled to recover from the non-prevailing party reasonable costs and attorney's

fees, including such fees and costs on appeal." Thus, the district court's award against the Estate under the Tricore PSA was not an abuse of discretion.

Second, section 12-120(3), in relevant part, provides:

> In any civil action to recover on a . . . contract relating to the purchase or sale of goods . . . or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

> The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. . . .

I.C. § 12-120(3). Here, the breach of contract claim against the Estate for which fees were awarded constitutes a commercial transaction. Thus, the district court did not abuse its discretion in awarding fees against the Estate under section 12-120(3).

Last, section 48-608, in relevant part, permits "reasonable attorney's fees to the plaintiff if he prevails." I.C. § 48-608(5). The district court found the Estate violated the ICPA. Thus, the district court did not abuse its discretion in awarding fees against the Estate pursuant to section 48-608(5).

Even so, "[w]here fees were not apportioned between a claim that qualifies . . . and one that does not, no fees are to be awarded." *See Rockefeller v. Grabow*, 136 Idaho 637, 645, 39 P.3d 577, 585 (2001). Because the district court's fee award against Stockton and Brinkmeyer was error, we remand to the district court for Tricore to apportion the fees incurred against the Estate from the fees incurred against Stockton and Brinkmeyer. *See Dickinson Frozen Foods, Inc. v. J.R. Simplot Co.*, 164 Idaho 669, 687, 434 P.3d 1275, 1293 (2019) (remanding a fee award to the district court after finding the district court's award was inappropriate because it did not apportion fees).

**G.** **The district court abused its discretion by adding $362,069.61 to the supersedeas bond to compensate Tricore for the loss of use of the property during this appeal.**

After entering judgment for Tricore, the district court granted the Appellants' motion to stay enforcement of the judgment pending appeal. The district court, among other things, ordered Appellants post an additional bond in the amount of $362,069.61 to compensate Tricore for its anticipated loss of use of the Warren Property during the appeal process. Brinkmeyer alone argues the district court erred in adding $362,069.61 to the supersedeas bond to compensate Tricore for the loss of use of the property during the appeal process. Brinkmeyer argues the additional bond

amount does not align with rules governing stay of judgments, nor did it align with the district court's damages findings.

Idaho Appellate Rule 13 authorizes the district court to stay a judgment during an appeal. In relevant part, I.A.R. 13(b) provides:

> **Stay Upon Appeal—Powers of District Court—Civil Actions**. In civil actions, unless prohibited by order of the Supreme Court, the district court shall have the power and authority to rule upon the following motions and to take the following actions during the pendency on an appeal:
>
> . . . .
>
>  (14) Stay execution or enforcement of any judgment, order or decree appealed from, other than a money judgment, upon the posting of such security and upon such conditions as the district court shall determine.

I.A.R. 13(b)(14). These actions may be taken to preserve the status quo throughout the appeal. *See Coeur D'Alene Turf Club, Inc. v. Cogswell*, 93 Idaho 324, 330, 461 P.2d 107, 113 (1969).

Although Rule 13(b)(14) grants the district court broad authority to impose certain conditions when a nonmonetary judgment is stayed, the district court's discretion is not unfettered. Here, the district court ordered an additional bond be posted in the amount of $362,069.61 to "compensate Tricore for the lost opportunity to develop the property while the matter is being appealed . . . that is equivalent to 136% of the total interest on the purchase price of $2.4 million for 18 months at the legal rate of 7.375%." The district court did not explain why it imposed an additional bond other than "[t]o compensate Tricore for the lost opportunity to develop the property while the matter is being appealed." The district court's arrival at the additional amount of $362,069.61 stems from the legal rate of interest and an estimated appeal window of eighteen months. There is no explanation as to why these criteria were used in the district court's calculation, particularly where the district court awarded no damages for the tortious interference claim at trial. Thus, we hold that because the district court did not act consistently with the legal standards applicable to the specific choices available to it, the court abused its discretion by requiring Appellants to post the additional bond of $362,069.61. Consequently, the district court's finding the necessity of posting an additional bond of $362,069.61 is reversed.

## H.    Tricore was entitled to damages for the Estate's violation of the ICPA but not for Stockton and Brinkmeyer's tortious interference.

The district court, after finding that the Estate breached the Tricore PSA, found Tricore was entitled to an award of specific performance. The court explained that specific performance

35

was the only appropriate remedy because of the uniqueness of the Warren Property and the conflicting testimony on the Warren Property's value at the time of the breach. As a result, the court declined to award any additional monetary damages to Tricore.

On cross-appeal, Tricore argues the district court erred by not awarding monetary damages to Tricore on the tortious interference claim and for the Estate's violation of the ICPA. According to Tricore, the court overlooked the evidence presented supporting an award of damages. Tricore argues it presented competent evidence of damages relating to preparing to use the Warren Property, the loss of the use of the Warren Property, and the increase in costs over the two years Tricore was deprived of the Warren Property because of this litigation. Tricore also argues it should have been awarded at least $1,000.00 in damages under the ICPA.

"A district court's award of damages will be upheld on appeal where there is sufficient evidence supporting the award." *Griffith v. Clear Lakes Trout Co., Inc.*, 143 Idaho 733, 740, 152 P.3d 604, 611 (2007). Damages must be proven with reasonable certainty. *Id.* "Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation." *Id.*

In a case of tortious interference with contract, tort damages are a better measure of damages than contract damages. *Barlow v. Int'l Harvester Co.*, 95 Idaho 881, 896, 522 P.2d 1102, 1117 (1974) *abrogated by Siercke v. Siercke*, 476 P.3d 376 (2020). "Thus, in a proper case, general damages, damages for unforeseen expenses, and even punitive damages may be recovered. Recovery for interference is not limited to those damages within the contemplation of the parties to the contract . . . ." *Id.*

Appellants allege Tricore is not entitled to damages because monetary damages and specific performance are mutually exclusive remedies. The appellants cite *Campbell v. Parkway Surgery Center, LLC*, 158 Idaho 957, 354 P.3d 1172 (2015), where this Court, to avoid double recovery, declined to consider specific performance when it ordered monetary damages. 158 Idaho at 969, 354 P.3d at 1184. But Tricore is not appealing the district court's award for the Estate's breach of contract claim, in which the court ordered specific performance. Instead, Tricore is appealing the district court's denial of monetary damages for Stockton and Brinkmeyer's tortious interference and for the Estate's violation of the ICPA. Thus, the fact that the district court ordered specific performance is not dispositive to Tricore's cross-appeal.

36

As for the tortious interference claim, it is undisputed that Tricore suffered damages. The district court explained that Tricore "lost both the property it had contracted to purchase and all of the time and money it had expended over the preceding year on feasibility studies, site analysis, engineering, and development plans." We recognize that in the proper circumstance damages may be awarded *in addition to specific performance*. *See*, *e.g.*, *Deeds v. Stephens*, 8 Idaho 514, 518–19, 69 P. 534, 538–39 (1902) (recognizing that if damages were adequately proven, on top of specific performance, "it would have been incumbent upon the court to ascertain the amount, if any, the appellant had sustained. . . ."); *Pern v. Stocks*, 93 Idaho 866, 871, 477 P.2d 108, 113 (1970) (damages, though awardable in specific performance action, were not proven with reasonable certainty, and were thus not awardable). That said, the district court found Tricore was entitled to no additional damages because such an award would amount to a double recovery. Tricore is the beneficiary of the court's equitable award of specific performance of the Tricore PSA. The district court found that any damages related to approximately $170,000 spent by Tricore "on various tasks, including the feasibility studies, the wetland delineation, engineering, and site analysis" were subsumed by the order of specific performance, since those charges did not accrue independently of Tricore's planned subdivision development. This conclusion is supported by substantial and competent evidence.

The district court also denied Tricore $2,500,000 in damages for the "loss of use of the property" because it found the amount was "pulled out of thin air." The number came from the estimated increase in costs of construction and development from 2016 to 2018. Mort testified, "I think it would take more money marketing th[e Warren Property] today than it would have a few years ago. So I think, you know, all of that said, I think between costs and all of those numbers, you know, if we can buy the property back we would be requesting an additional two and a half million." Robert Gordon, an expert called by the defense, testified to the increase in costs of construction and development in the two years. Gordon agreed with Mort that the cost of construction and development had increased. Yet Gordon could not provide an amount as to how much the costs had increased, nor would he provide a speculative percentage without more information. Thus, the district court weighed these facts and concluded that the amount asserted by Tricore for loss of use of the property was not proven to a reasonably certainty. *See Griffith*, 143 Idaho at 740, 152 P.3d at 611; *Pern*, 93 Idaho at 871, 477 P.2d at 113. Although tort damages differ from contract damages and do not require proof by mathematical exactitude, *see Cramer v.*

37

*Slater,* 146 Idaho 868, 879, 204 P.3d 508, 519 (2009), the district court, as the trier of fact, still found the proof lacking to award tort damages for the delay occasioned by Stockton and Brinkmeyer's tort. *See id.* (Where "injuries are subjective and measurable with only an approximation of certainty, their award is primarily a question for the [trier of fact] and an appellate court should interfere with such a verdict only in the most exceptional circumstances.") Thus, while there is some evidence in the record to support Tricore's claimed damages due to the delay occasioned by Stockton and Brinkmeyer's tort, we decline to interfere with the court's finding that is supported by substantial and competent evidence.

As for the ICPA, "[a]ny person who purchases . . . goods . . . and thereby suffers any ascertainable loss . . . as a result . . . of a method, act or practice declared unlawful by this act . . . may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is greater[.]" I.C. § 48-608(1). Thus, at a minimum, a victim of an ICPA violation is entitled to at least one thousand dollars in damages. *White v. Mock*, 140 Idaho 882, 890, 104 P.3d 356, 364 (2004) ("Having determined that the Mocks had engaged in an act or practice which was misleading, false, or deceptive to White, in violation of the [ICPA], the jury was required to make an award of at least one thousand dollars to White."). The district court found the Estate violated the ICPA, which we affirm. Under section 48-608(1), a victim of an ICPA violation is entitled to at least one thousand dollars in damages. *White,* 140 Idaho at 890, 104 P.3d at 364. The district court erred in finding Tricore was not entitled to at least one thousand dollars in damages because of the Estate's violation of the ICPA. We hold that Tricore is entitled to $1,000 in damages against the Estate for its ICPA violation, as a matter of law.

In conclusion, the district court ordered specific performance of the Tricore PSA. It did so by requiring Stockton and Brinkmeyer, through PLBM, to reconvey the Warren Property to Tricore and for Tricore to compensate Stockton and Brinkmeyer the purchase price, $2,400,000. We affirm and clarify that the $2,400,000 is to be paid to Stockton and Brinkmeyer without interest.

## I.     Attorney fees on appeal.

The Estate requests fees on appeal pursuant to Idaho Code section 12-120(3) and costs under Idaho Code section 12-107 and Idaho Appellate Rule 40. The Estate argues a prevailing party may be awarded fees under section 12-120(3) although it argues a contract or commercial transaction never existed. Tricore requests fees on appeal under Idaho Code section 12-121 arguing

the Estate, Stockton, and Brinkmeyer are simply asking this Court to second-guess the district court's decisions. Tricore also argues this Court can award fees on appeal pursuant to the Tricore PSA and section 12-120(3).

"Attorney fees under Idaho Code section 12-120(3) are appropriately awarded to the prevailing party '[i]n any civil action . . . in any commercial transaction[.]' " *Alsco*, 166 Idaho at 535, 461 P.3d at 817 (quoting I.C. § 12-120(3)). Commercial transaction is "defined to mean all transactions except transactions for personal or household purposes." I.C. § 12-120(3). "The test for determining whether this provision authorizes an award of attorney fees is whether the commercial transaction comprises the gravamen of the lawsuit." *Alsco*, 166 Idaho at 535, 461 P.3d at 817 (quoting *Erickson v. Flynn*, 138 Idaho 430, 436, 64 P.3d 959, 965 (Ct. App. 2002)) (internal quotations omitted).

The Tricore PSA provides "[i]f either party initiates or defends any arbitration or legal action or proceedings which are in any way connected with this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party reasonable costs and attorney's fees, including such costs and fees on appeal."

Idaho Code section 12-121 provides, in part, "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolous, unreasonably or without foundation." "Those circumstances exist when appellants simply ask the 'appellate court to second-guess the trial court by reweighing the evidence or ha[ve] failed to show that the district court incorrectly applied well-established law.' " *Lola L. Cazier Revocable Tr. v. Cazier*, 167 Idaho 109, 228–29, 468 P.3d 239, 252–53 (2020) (quoting *Clark v. Jones Gledhill Fuhrman Gourley, P.A.*, 163 Idaho 215, 230, 409 P.3d 795, 810 (2017)). This Court will not award fees when good-faith arguments are raised on appeal. *Id*. at 229, 468 P.3d at 253.

"[T]he prevailing party determination is based on the action as a whole." *City of Middleton v. Coleman Homes, LLC*, 163 Idaho 716, 732, 418 P.3d 1225, 1232 (2018). "The question is not to be examined claim-by-claim. *Id*. "The determination should be based on what party prevailed on the 'primary issues of [the] litigation.' " *Id*. at 726, 418 P.3d at 1235 (quoting *Idaho Mil. Hist. Soc'y, Inc. v. Maslen*, 156 Idaho 624, 630, 329 P.3d 1072, 1078 (2014)).

Tricore prevailed on the primary issues of the litigation as against the Estate: the breach of contract and ICPA claims. Thus, Tricore is the prevailing party as against the Estate. Tricore is

entitled to attorney fees under the Tricore PSA and section 12-120(3) against the Estate on the breach of contract claim. It is also entitled to attorney fees against the Estate on the independent ground of Idaho Code section 48-608(5). Because we reverse the district court's finding that the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy, attorney fees on appeal are not awardable against Stockton or Brinkmeyer under section 12-120(3) or the Tricore PSA.

Tricore also seeks fees pursuant to section 12-121. However, Appellants' arguments were made in good faith and they did not ask this Court to simply second-guess what was decided below. In fact, the Estate, Stockton, and Brinkmeyer succeeded in their efforts to reverse the district court's findings as to the civil conspiracy claim, the attorney fee award on a joint and several basis, the additional bond and, in part, the district court's denial of damages to Tricore. Thus, Tricore is not entitled to fees on appeal against any Appellant under section 12-121.

## VI. CONCLUSION

We affirm the district court's grant of summary judgment for Tricore on the Estate's statute of frauds defense. We also affirm these findings of the district court: 1) the Estate breached the Tricore PSA; 2) the Estate violated the ICPA; and 3) Stockton and Brinkmeyer tortiously interfered with the Tricore PSA.

We reverse the district court's finding that the Appellants engaged in a civil conspiracy. As a result, we affirm the district court's attorney fee award only as it applies to the Estate and remand to the district court to apportion fees against the Estate from fees against Stockton and Brinkmeyer. We also reverse the district court's requirement that Appellants post an additional supersedeas bond in the amount of $362,069.61 and order that amount of the bond to be returned to the party or parties posting the same.

On cross-appeal, we affirm the district court's decision that Tricore is not entitled to monetary damages on the tortious interference claim. However, we reverse the district court's finding on damages awarded under the ICPA and we hold that Tricore is entitled to $1,000 in damages under Idaho Code 48-608(1).

Tricore is the prevailing party on appeal and is entitled to its costs and attorney fees pursuant to the Tricore PSA and section 12-120(3) against the Estate only. Stockton and Brinkmeyer are not entitled to costs since they prevailed only in part.

JUSTICES BURDICK, STEGNER and MOELLER, CONCUR.

BRODY, Justice, dissenting.

I respectfully dissent. From my vantage point, this case centers on whether the purchase and sale agreement between Tricore and the Estate is invalid because it violates the statute of frauds. I conclude that the agreement is invalid because the reservation of a parcel or parcels "in size not less than 200 feet of waterfront" fails to sufficiently describe the portion of Parcel A that is to be retained. Consequently, the agreement also fails to sufficiently describe the portion of the property that is to be sold. Therefore, I would reverse the district court's ruling concerning the Estate's statute of frauds defense, vacate the judgment, and remand the case to the district court.

This Court has long-held that an agreement concerning the sale of real property must contain a sufficient description of the property to be sold to satisfy the requirements set forth in Idaho Code section 9-505(4). *Lexington Heights Dev., LLC v. Crandlemire ("Lexington Heights")*, 140 Idaho 276, 280, 92 P.3d 526, 530 (2004). A description of the property to be sold "will be sufficient so long as [the] quantity, identity or boundaries of [the] property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *Id.* at 281, 92 P.3d at 531 (quoting *City of Kellogg v. Mission Mountain Interests, Co.*, 135 Idaho 239, 244, 16 P.3d 915, 920 (2000)). Reasonable certainty is not enough. *Ray v. Frasure*, 146 Idaho 625, 629–30, 200 P.3d 1174, 1178–79 (2009). "[A] property description [must] designate 'exactly' what property the seller is conveying to the buyer." *Id.* (quoting *Garner v. Bartschi*, 139 Idaho 430, 435–30, 80 P.3d 1031, 1036–37 (2003)).

Here, the Estate contends it is not possible to ascertain the boundaries of the property that is to be reserved and retained because the parcel or parcels could be configured in several different ways. Tricore disagrees, arguing instead that three out of the four boundaries are ascertainable because they can be established by reference to the shoreline of the lake, the location of the existing road, and the location of the "Tax 31" parcel. As Tricore conceded during oral argument, however, at least one boundary cannot be ascertained because Tricore has not yet determined how the plat for the proposed development will be configured. For our purposes, it is irrelevant which party is correct. The important point is that it is *undisputed* that the agreement does not fully describe the boundaries of the property that is to be reserved and retained. Additionally, the agreement does not address the "quantity" or the "identity" of the property to be retained.

In *Lexington Heights*, this Court addressed a similar issue. 140 Idaho at 278–80, 92 P.3d at 528–30. Roger and Elizabeth Crandlemire owned 95 acres. *Id.* at 278, 92 P.3d at 528. They

entered into an agreement to sell approximately 90 acres of their property to Lexington Heights Development, LLC. *Id.* The agreement stated that the sale excluded "the residential dwelling (which will include no more than five acres) . . . ." *Id.* Additionally, the agreement indicated that "the precise size, location, dimensions and configuration" of the property to be excluded from the sale would be determined later. *Id.* After a dispute arose between the parties, the Crandlemires refused to consummate the sale to Lexington Heights and sold 40 acres of their property to a third party. *Id.* at 279, 92 P.3d at 529. Lexington Heights filed suit, seeking specific performance and damages. *Id.* The district court held that the agreement was invalid because it did not contain a sufficient description of the property to be sold. *Id.* at 278, 92 P.3d at 528. This Court reached the same conclusion on review. *Id.* at 282, 92 P.3d at 532. "The legal description in the Agreement does not contain a sufficient description of the property to be sold because it does not contain any description sufficient to identify the approximate five-acre parcel that is to be excluded from the sale." *Id.* Therefore, this Court held that the agreement was invalid. *Id.* at 285, 92 P.3d at 535.

Similar to the parties in *Lexington Heights*, who agreed to reserve "no more than five acres" from the sale of the larger 95-acre property, the parties here agreed to reserve "not less than 200 feet of waterfront" from the sale of the larger 65-acre property. Like the agreement in *Lexington Heights*, which did not include a sufficient description of the property that was to be excluded from the sale, the agreement here does not include a sufficient description of the property to be excluded from the sale, either. Thus, like the agreement in *Lexington Heights*, which was invalid because it lacked a sufficient description of the property to be sold, the agreement here is invalid for the same reason. In short, the agreement here, like the agreement in *Lexington Heights*, violates the statute of frauds.

The district court concluded the agreement does not violate the statute of frauds because it includes a sufficient description of the larger 65-acre property, which consists of parcels A, B, and C. That conclusion ignores the fact, however, that the agreement does not contemplate the sale of Parcel A in its entirety. Rather, the agreement contemplates the sale of a *portion* of Parcel A. Section 3 of the second addendum to the agreement contains a legal description for Parcel A, but notes that Parcel A is subject to conditions. Section 5 of the second addendum to the agreement then states:

> The Sellers reserve and retain from Parcel A and Buyer shall create in compliance with Bonner County Planning and Zoning provisions and approval, a parcel(s) in size not less than 200 feet of waterfront (or two 100 foot parcels –

consistent with Buyer's development) adjacent to Tax 31 between the existing access road and the lake.

Stated differently, the agreement contemplates that the Estate will retain a portion of Parcel A and sell the remainder of the property to Tricore. As explained previously, however, the reservation of "not less than 200 feet of waterfront" fails to sufficiently describe the property to be reserved and retained by the Estate. Because there is not a sufficient description of the property that is to be reserved and retained, there is not a sufficient description of the portion of the property that is to be sold, either. It is irrelevant whether there is a sufficient description of the larger 65-acre property (i.e., a sufficient description of Parcels A, B, and C); there must be a sufficient description of the portion of the property that is to be sold in order to satisfy the statute of frauds. There is no such description in the agreement.

For the foregoing reasons, I conclude that the agreement between Tricore and the Estate is invalid because it violates the statute of frauds. Moreover, the invalidity of the agreement directly impacts other issues decided by the district court. Thus, I would reverse the district court's ruling dismissing the Estate's statute of frauds defense, vacate the judgment, and remand the case to the district court with instructions to render a new decision consistent with our holding in *Lexington Heights*.